A96A1685. McLANE v. ATLANTA MARKET CENTER MANAGEMENT COMPANY et al.

(486 SE2d 30)

McMURRAY, Presiding Judge.

Laura J. McLane — a licensed real estate agent — brought an action against her former employer, The Atlanta Market Center Management Company ("the broker"), the owners of an Atlanta office building known as the Inforum Mart ("the Inforum"), Inforum Associates, Inforum, LTD and Equitable Life Assurance Society of the United States ("the property owners"), and the property owners' asset manager, Equitable Real Estate Investment Management, Inc. ("Equitable"), alleging the broker, the property owners and Equitable duped her out of a $246,618 lease commission after her primary

client, Atlanta Committee for the Olympic Games, Inc. ("ACOG"), "announced intentions to acquire 165,000 additional square feet of expansion space at the Inforum." Specifically, McLane alleges that the broker hired her on a salary plus commission basis to lease space at the Inforum and that the broker breached this agreement by discharging her without severance pay and failing to pay her commission for ACOG's subsequent lease expansion. McLane also alleges that Equitable tortiously interfered with her employment contract by refusing to allow her (or the broker) to negotiate with ACOG in violation of the broker's exclusive right to lease the Inforum; that the broker assured her (after terminating McLane's employment) that it would protect her commission rights; that contrary to this promise (and the broker's fiduciary responsibility as a real estate professional and employer) the broker entered into a deal with Equitable resolving its commission claim without protecting McLane's commission rights and that the broker, the property owners and Equitable unfairly converted her share of this settlement agreement. McLane's damage claims are based on breach of contract, quantum meruit, unjust enrichment and tort. She also seeks punitive damages, attorney fees and expenses of litigation.

After filing separate answers, the broker, the property owners and Equitable filed a joint motion for summary judgment. McLane filed a motion for partial summary judgment. The matters of record underlying these opposing motions, when viewed from the perspective prescribed in *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474), reveal the following:

On October 20, 1987, the property owners granted the broker exclusive rights to manage and lease the Inforum and agreed to pay the broker a percentage of all lease revenues. Three years later, the broker stipulated that this exclusive agency agreement will expire on October 11, 1992, and that its right "to receive any compensation or other remuneration . . . shall expire upon the date of [the exclusive agency agreement's] termination or expiration."

In January 1989, the broker hired McLane "[t]o help develop [a] marketing program that attracted technology companies into the [Inforum]." Over two years later, the broker offered McLane a position as a leasing agent or "leasing director." McLane agreed to change jobs based upon an understanding that her "sole responsibility [would be] to lease the building and to bring in tenants. . . ." She also relied on the broker's promise to pay her a salary plus $1.50 for every square foot she leased, including additional square footage leased by any Inforum tenant which the broker assigned to McLane. The only conditions to McLane's commission rights were execution of

a lease or lease amendment and the tenant's occupancy of the leased space.[1]

In early 1991, Jim Kranzusch, the broker's General Manager and Executive Vice President, employed the broker's entire leasing staff to attract ACOG to the Inforum, including McLane. McLane occasionally "met as a group [with this leasing team] to strategize on how to bring and attract ACOG into the facility [and she] assisted in the actual presentation to ACOG."[2] When ACOG subsequently executed a lease for 29,081 square feet on the Inforum's sixth floor (with expansion options on the same floor), the broker paid McLane $3,000 for her contributions to the leasing team and later assigned her the ACOG lease. McLane thereafter devoted most of her time — approximately 75 percent — to ACOG.

In assisting ACOG develop its sixth floor expansion option, McLane "helped [ACOG representatives] from everything to meeting with their architects and identifying needs to helping [ACOG's Administrative Services Manager, Gladys L. Andrews,] do . . . the conceptual drawing [which helped] determine how much space [ACOG] needed." McLane's efforts resulted in five successive lease amendments which provided ACOG with additional space and yielded McLane about $32,000 in commissions. McLane's efforts were stifled, however, when ACOG asked for more office space.

McLane received a letter from Gladys L. Andrews — dated July 22, 1992 — indicating ACOG's desire to execute a final sixth floor lease amendment on September 18, 1992. Andrews informed McLane that ACOG anticipated occupancy of this space on November 25,

---

[1] The appellees cite page 618 of the record in support of the following assertion: "Because these leasing director bonus commissions were derivative of the payments [the broker] received from [the property owner], neither McLane nor any other leasing agent ever received a commission payment unless and until [the broker] received a corresponding payment from [the property owner]." This statement, however, is not supported by page 618 of the record. This area of the record is an excerpt from Laura J. McLane's deposition indicating McLane's perception that her right to a commission was neither derivative of nor dependent upon the broker's commission rights. We include the cited portion of McLane's deposition testimony, which pertinently begins on page 618 of the appellate record, as an Appendix to this opinion.

[2] In the factual summary on page 7 of appellees' brief, appellees assert the following: "McLane had no role in initially bringing ACOG into the Inforum as a tenant, rather, AMC assigned McLane the ACOG account after the ACOG Lease was executed." This statement, however, is not only misaligned with McLane's deposition testimony (which we quote), it is refuted on the very page of the appellate record cited by appellees, i.e., page 624. Perhaps appellees' statement of fact is attributable to a misunderstanding of the applicable summary judgment standard. "The applicable summary judgment standard is that of *Lau's Corp. v. Haskins*, [supra]. In ruling on a motion for summary judgment, the opposing party should be given the benefit of all reasonable doubt, and the court should construe the evidence and all inferences and conclusions arising therefrom most favorably toward the party opposing the motion. *Moore v. Goldome Credit Corp.*, 187 Ga. App. 594, 595-596 (370 SE2d 843)." *Orion Capital Partners, L. P. v. Westinghouse Elec. Corp.*, 223 Ga. App. 539, 541 (1) (478 SE2d 382).

1992; that ACOG's long-term space needs exceeded the lease's sixth floor expansion options and that ACOG projected a need for an additional 90,000 square feet of office space. Andrews then asked McLane to "provide [her] with rate options to expand on the fifth floor, the Apparel Mart, and/or surrounding Marts."

McLane informed the broker's new General Manager and Executive Vice President, Brian D. Hogg, and Equitable's Director of Asset Management, William Randolph Forth, about ACOG's expansion requests and asked for their advice. Forth responded by bypassing the broker and McLane and opening direct negotiations with ACOG via a letter dated August 12, 1992. Forth then notified the broker (on August 25, 1992) that its exclusive right to manage and lease the Inforum will terminate when it expires on October 31, 1992, and, on September 30, 1992, Equitable instructed the broker and McLane not to contact ACOG regarding further lease expansion. Equitable's "Investment Officer" and "Senior Vice President," Grant Grimes, ultimately notified the broker, in a letter dated October 19, 1992, that a commission would not be paid for ACOG's sixth lease amendment if the deal was not closed before October 31, 1992.

On October 31, 1992, the broker terminated McLane's employment and offered her a severance package which required her to give up any commission claim for ACOG's most recent lease expansion request. McLane refused this offer and pressed the broker to honor its promise to pay her a commission for the pending ACOG expansion deal. The broker's Vice President of Human Resources, Lawrence B. Gardner, responded by posting the following letter, dated December 10, 1992, to McLane: "As I see it, this is a rather simple issue. We, as much as you, are interested in receiving commissions for any ACOG expansions. As stated in [an earlier] letter to you[,] we will endeavor to add ACOG to the list of "INFORUM Associates Acknowledged List of Lease Prospects by AMCMC at INFORUM." If we receive any commissions from Equitable from [this list], now or in the future, we will pay you your proportionate share of those commissions. . . . It is certainly our intention to continue to pursue this issue with Equitable and resolve it."

In a letter dated December 22, 1992, Brian D. Hogg pressed Equitable "Senior Vice President" and "Investment Officer" Grant Grimes to pay the broker's commission for ACOG's sixth lease expansion. Grimes responded negatively in a letter dated December 30, 1992, reminding Hogg that "[t]he original management agreement . . . between [the property owners] and [the broker] eliminated any obligation on the part of [the property owners] to pay [the broker] a termination fee if and when the management agreement was terminated." Two days later, January 1, 1993, the property owners and the broker settled this dispute by entering into a deal which does not

contemplate McLane's commission rights. Specifically, the property owners allowed the broker exclusive rights to manage and lease certain "Convention Facilities" in exchange for the broker's stipulation that it "has been paid in full by [the property owners] all amounts required to be paid . . . under the Prior Agreement. . . ." The broker also agreed to "hold [the property owners] harmless from any claim asserted against [the property owner] by any present or former employees or agent of [the broker] arising out of or resulting from the Prior Agreement. . . ."

On February 18, 1993, ACOG executed its sixth lease amendment for additional space at the Inforum. This amendment provided ACOG with 51,412 additional square feet on the Inforum's sixth floor and 113,000 square feet on the Inforum's fifth floor. On the day ACOG executed this lease amendment, the broker's Executive Vice President and General Manager, Brian D. Hogg, transmitted the following memorandum to another employee of the broker: "Rob, I suggest we hold Laura [McLane's commission] check [on a lease transaction unrelated to the ACOG lease transaction] until we negotiate a settlement with her on the ACOG transaction."

The trial court granted the joint motion for summary judgment filed by the broker, the property owners and Equitable and denied McLane's motion for partial summary judgment. This appeal followed. *Held*:

1. McLane contends the trial court erred in granting the broker's motion for summary judgment and denying her motion for summary judgment with regard to the commission she allegedly earned for ACOG's sixth lease expansion.

"The first requirement of the law relative to contracts is that there must be a meeting of the minds of the parties, and mutuality (*Simpson & Harper v. Sanders & Jenkins*, 130 Ga. 265 (60 SE 541); *Gray v. Lynn*, 139 Ga. 294 (77 SE 156)), and in order for the contract to be valid the agreement must ordinarily be expressed plainly and explicitly enough to show what the parties agreed upon. *Georgia Southern & F. R. Co. v. Taylor*, 142 Ga. 550 (82 SE 1058); *Crawford v. Williford*, 145 Ga. 550 (89 SE 488); *Williams v. Manchester Bldg. Supply Co.*, 213 Ga. 99 (97 SE2d 129)." *West v. Downer*, 218 Ga. 235, 241 (5) (127 SE2d 359). In the case sub judice, the terms of McLane's oral employment contract are undisputed. The broker's former General Manager and Executive Vice President, Jim Kranzusch, deposed that he hired McLane in February 1991, and that he promised her a fixed salary plus $1.50 for every square foot she leased, including additional space leased by any Inforum tenant the broker assigned to McLane. Kranzusch also deposed that the only conditions to McLane's commission rights were execution of a lease or lease amendment and the tenant's occupancy of the leased space. Although

it appears undisputed that these conditions were satisfied with regard to ACOG's sixth lease expansion request, the broker argues that McLane is not entitled to a commission because her oral-at-will employment contract terminated before ACOG executed its sixth lease expansion amendment and before ACOG occupied the leased space. This argument is without merit.

While it is true that "an employee cannot sue to enforce future performance of a terminable-at-will employment agreement[,] an employee may sue on an oral contract for employment terminable at will 'for the amount of compensation due [her], based upon services actually performed by [her] up to the time of [her] discharge, and not for damages or for compensation for services not performed or for any breach of contract.' *Brazzeal v. Commercial Cas. Ins. Co.*, 51 Ga. App. 471 (180 SE 853) (1935). [Moreover, where] an employee has been discharged under a terminable-at-will employment contract, [she] may bring an action to recover the commissions due [her] in accordance with the employment agreement. *Brazzeal*, supra." *E. D. Lacey Mills v. Keith*, 183 Ga. App. 357, 359 (2) (359 SE2d 148). It is undisputed in the case sub judice, that McLane's employment contract called for the broker to pay her $1.50 for every square foot ACOG leased and that the only conditions to this right were ACOG's execution of a lease amendment and occupancy of the leased space. Because it is undisputed that these conditions have been satisfied, because there is no proof that McLane's commission rights would expire upon termination of her employment, or termination of the broker's exclusive right to lease the Inforum, and since there is no proof that McLane's commission rights were conditioned upon the broker's recovery of a commission, McLane is entitled — as a matter of law — to a commission for ACOG's sixth lease amendment. *Lau's Corp. v. Haskins*, 261 Ga. 491, 495 (4), supra. The trial court therefore erred in granting the broker's motion for summary judgment with regard to McLane's commission claim. The remaining question is whether McLane is entitled to summary judgment for the sum she claims is due, i.e., $246,618.

"Generally, '(w)here by a breach of contract a party is injured, [she] is bound to lessen the damages as far as is practicable by the use of ordinary care and diligence.' OCGA § 13-6-5; *Central Nat. Ins. Co. &c. v. Dixon*, 188 Ga. App. 680, 682 (373 SE2d 849) (1988). However, '(t)he rule requiring the plaintiff to protect [herself] from loss arising from breach of a contract is not applicable where there is an absolute promise to pay. . . .' *Reid v. Whisenant*, 161 Ga. 503, 510 (131 SE 904) (1926); see *J. C. Penney Cas. Ins. Co. v. Woodard*, 190 Ga. App. 727, 729 (380 SE2d 282) (1989); *Haley v. Oak Apartments, Ltd.*, 173 Ga. App. 44, 46 (325 SE2d 602) (1984). [The case sub judice] is not a case where an employee seeks to recover as damages the

remainder of [her] salary after being terminated prior to the expiration of the contractual term of employment. In those cases, mitigation of damages may be applicable. *Autotax, Inc. v. Data Input Corp.*, 136 Ga. App. 141, 142 (220 SE2d 456) (1975); *Western Host Atlanta v. Bass*, 183 Ga. App. 160 (358 SE2d 312) (1987). Rather, after [termination of her oral-at-will] employment contract, [McLane] sought to collect [a commission] required to be paid to [her] after such termination under the express terms of [her employment] contract. *Royal Crown Cos. v. McMahon*, 183 Ga. App. 543, 546 (359 SE2d 379) (1987) (plaintiff's right to severance pay was absolute under contract); *Atlanta &c. Clinics, P. A. v. Patton*, 176 Ga. App. 2, 3 (335 SE2d 141) (1985)." *Victory Sign Indus., Ltd. v. Potter*, 208 Ga. App. 570, 571 (430 SE2d 882). McLane has shown, in the case sub judice, that these terms were fixed and absolute, allowing her $1.50 for every square foot ACOG leased. McLane was therefore under no obligation to mitigate damages. Accordingly, since it is undisputed that ACOG executed a lease amendment for 164,412 additional square feet, and that ACOG occupied this area, McLane is entitled to a $246,618 commission for ACOG's sixth lease amendment. The trial court therefore erred in denying summary judgment as to this aspect of McLane's breach of contract claim and is hereby directed, upon remand, to enter summary judgment for McLane and against the broker for the sum of $246,618, plus interest.

2. McLane next contends the trial court erred in granting the broker's motion for summary judgment with regard to her severance pay claim. We do not agree.

"While a contract will not be held unenforceable for indefiniteness because its performance is, as to particular details, left open to subsequent agreement of the parties, see *Advance Security v. Superior Surgical &c. Co.*, 197 Ga. App. 769, 771 (1) (399 SE2d 488) (1990), extrinsic information 'may not be utilized to supply that which is essential to constitute a valid contract. (Cit.)' [*West v. Downer*, 218 Ga. 235, 241 (5), 242, supra]." *White & Assoc. v. Decker & Hallman, P. C.*, 203 Ga. App. 14 (1), 15 (416 SE2d 352). In the case sub judice, McLane offers no proof that the broker promised to pay her any determinable sum as severance pay. McLane gave deposition testimony that her severance pay claim is based upon what the broker offered other employees and upon what she "thought . . . was a fair amount." Because price is an essential element of a valid contract, the trial court did not err in granting summary judgment in favor of the broker as to this aspect of McLane's breach of contract claim. See *BellSouth Advertising &c. Corp. v. McCollum*, 209 Ga. App. 441, 444 (2) (433 SE2d 437).

3. The trial court did not err in granting summary judgment in favor of the broker, the property owners and Equitable on McLane's

conversion claims because such an action for conversion "lies only for the withholding of 'certain bills or coins' and does not lie on account of a mere failure to pay money due under a contract. *Faircloth v. A. L. Williams & Assoc.*, 206 Ga. App. 764 (1) (426 SE2d 601) (1992); *Hodgskin v. Markatron*, 185 Ga. App. 750, 751 (1) (365 SE2d 494) (1988); *Cooke v. Bryant*, 103 Ga. 727 (30 SE 435) (1898)." *Morris v. Nat. Western Life Ins. Co.*, 208 Ga. App. 443, 444 (2) (430 SE2d 813).

4. McLane contends the trial court erred in granting summary judgment on her breach of fiduciary duty claims, arguing that a jury should decide whether the broker breached its fiduciary responsibility — as McLane's employer and real estate broker — by failing to fully compensate her and protect her interests while negotiating its own commission dispute with Equitable. McLane advances the law of civil conspiracy to impute liability to Equitable for this alleged breach of fiduciary duty.

(a) *The Broker's Fiduciary Duties.* We find that the broker, as a real estate professional and employer, had a fiduciary obligation to compensate McLane and to protect her during the parties' agency relationship. "The relationship of principal and agent is fiduciary in character, and imposes upon the parties the duties of exercising toward each other the utmost good faith. Civil Code, § 4030 [now OCGA § 23-2-58]." *Williams v. Moore-Gaunt Co.*, 3 Ga. App. 756, 759 (60 SE 372). Just as the law implies, as a part of the contract by which every agency arises, that the agent agrees to have and exercise, for and toward the principal, loyalty and absolute good faith, *Reisman v. Massey*, 84 Ga. App. 796, 799 (1) (67 SE2d 585), the law implies that the principal agrees to compensate, indemnify and protect its agent. 1A Encyclopedia of Georgia Law, Agency, §§ 62-73. See Restatement of the Law, Agency 2d, Introductory Note to Ch. 14, §§ 432-528. "A fiduciary who commits a breach of his duty as a fiduciary is guilty of tortious conduct to the person for whom he should act [and] the beneficiary is entitled to tort damages for harm caused by the breach of a duty arising from the relation. . . ." Restatement of the Law, Torts 2d, § 874, comment b. These fiduciary principles, applied in the context of the case sub judice, thus mark the broker's duty not to usurp a business opportunity — assigned to and allegedly cultivated by McLane — arising by virtue of the parties' fiduciary relationship.

The broker's Vice President of Human Resources, Lawrence B. Gardner, assured McLane, in a letter dated December 10, 1992, that the broker would "continue to pursue [its claim for a commission for ACOG's sixth lease expansion] with Equitable and resolve it." Gardner also assured McLane that, "[i]f we receive any commissions from Equitable . . ., now or in the future, we will pay you your proportionate share of those commissions." Less than three weeks later, how-

ever, the broker settled its commission dispute with the property owners without regard for McLane's commission rights. And on the day ACOG executed its sixth lease amendment, the broker's Executive Vice President and General Manager, Brian D. Hogg, suggested holding "Laura [McLane's commission] check [on a lease transaction unrelated to the ACOG lease transaction] until we negotiate a settlement with her on the ACOG transaction." This proof, and the undisputed fact that the broker has not paid McLane's commission for ACOG's sixth lease amendment, is sufficient to authorize a jury's finding that the broker breached its fiduciary duties to fully compensate McLane and protect her commission rights during negotiations with Equitable.

(b) *Imputing Liability to Equitable via Civil Conspiracy.* " 'A conspiracy is a combination to accomplish an unlawful end, or to accomplish a lawful end by unlawful means.' *Luke v. Dupree*, 158 Ga. 596 (124 SE 13)." *Foster v. Sikes*, 202 Ga. 122, 125 (42 SE2d 441). In the case sub judice, McLane's conspiracy theory is based upon Equitable's alleged actions in influencing the broker not to pay McLane's commission and not to honor its promise to pay McLane's commission "[if the broker received] any commissions from Equitable. . . ." Although we find no direct proof of such an endeavor, we find circumstances which raise genuine issues of material fact as to Equitable's liability for conspiring with the broker to deprive McLane of her commission for ACOG's sixth lease amendment.

Because civil conspiracy is by its very nature a secret endeavor, and thus rarely open to direct proof, concert of action, amounting to conspiracy, is best suited for jury resolution and may be proved by either direct or circumstantial evidence. In other words, it is unnecessary to prove an express compact among the alleged conspirators. A jury may infer a civil conspiracy from the nature of the alleged wrongdoers' acts, the relation between them, their mutual interests in the matter, and other circumstances. *First Fed. Savings Bank v. Hart*, 185 Ga. App. 304, 305 (2) (363 SE2d 832). It is undisputed in the case sub judice that the broker, in a letter dated December 22, 1992, pressed Equitable to pay a commission for ACOG's sixth lease expansion, but soon abandoned this claim (on January 1, 1993) when Equitable arranged for the property owners to give the broker exclusive rights to manage and lease certain "Convention Facilities" in exchange for the broker's stipulation that it "has been paid in full by [the property owners] all amounts required to be paid . . . under the [property owners'] Prior Agreement [for the broker to manage and lease the Inforum]." It is also undisputed that McLane did not know about the negotiations between the broker and Equitable, or the resulting deal which included the broker's promise to "hold [the property owners] harmless from any claim asserted against [the property

owner] by any present or former employees or agent of [the broker] arising out of or resulting from the Prior Agreement. . . ." We find that this proof, along with proof that Brian D. Hogg — on the same day ACOG executed its sixth lease amendment — proposed "hold[ing] Laura [McLane's commission] check [on an unrelated lease transaction] until we negotiate a settlement with her on the ACOG transaction," raises genuine issues of material fact as to Equitable's liability for conspiring, if so found, with the broker to deprive McLane of a commission for ACOG's sixth lease amendment.

5. McLane contends the trial court erred in granting summary judgment to Equitable with regard to her claim that Equitable interfered with her employment contract and frustrated her ability to earn a commission for ACOG's sixth lease amendment.

"Tortious interference with contract requires proof of: (1) an independent wrongful act of interference by a stranger to the contract; (2) malicious intent to cause injury; and (3) resulting damage. See *Hylton v. American Assn. &c.*, 214 Ga. App. 635, 638 (2) (448 SE2d 741) (1994); *Singleton v. Itson*, 192 Ga. App. 78, 79 (383 SE2d 598) (1989)." *Barnwell v. Barnett & Co.*, 222 Ga. App. 694, 695 (1) (476 SE2d 1). "Malice, as herein used, is a term to be given a liberal meaning; malicious or maliciously means any unauthorized interference, or any interference without legal justification or excuse. *Arford v. Blalock*, 199 Ga. App. 434, 441 (13) (405 SE2d 698); *Forehand v. Perlis Realty Co.*, 198 Ga. App. 165, 166 (400 SE2d 644)." *Renden, Inc. v. Liberty Real Estate &c.*, 213 Ga. App. 333, 334 (2) (444 SE2d 814). Proof in the case sub judice that Equitable took over ACOG lease negotiations after learning about ACOG's request for over 90,000 additional square feet of office space; that Equitable thereafter prohibited McLane from contacting ACOG regarding further lease expansion (at any office facility) and that Equitable delayed executing ACOG's sixth lease amendment (beyond ACOG's projected execution date of September 18, 1992) until after termination of McLane's employment is sufficient to authorize a jury's finding that Equitable maliciously interfered with McLane's efforts to procure a sixth lease amendment pursuant to the terms of her employment contract. See *Christopher Investment Properties v. Cox*, 219 Ga. App. 440, 442 (1), 443 (465 SE2d 680). Additionally, the evidence cited in Division 4 (d) of this opinion, indicating that Equitable influenced the broker into not honoring its promise to pay McLane's commission for ACOG's sixth lease amendment, is sufficient to authorize a jury's finding that Equitable maliciously interfered with McLane's right to compensation under her employment contract.[3] Further, we reject Equitable's

---

[3] This aspect of McLane's tortious interference claim appears to be the foundation of

assertion that it was not a stranger to McLane's employment contract because of its right to negotiate directly with ACOG.

Although Equitable may have had a right to negotiate directly with ACOG, *Stone v. Reinhard*, 124 Ga. App. 355, 356 (1) (183 SE2d 601), this right did not provide Equitable with power to interfere with McLane's right to perform or collect commissions under the terms of her employment contract. It is undisputed that Equitable was not a party to McLane's employment contract and we find no conclusive proof in the record, or law, bestowing Equitable with power to isolate McLane (or the broker) from any Inforum lease negotiations before expiration of the broker's exclusive right to lease the Inforum. Consequently, since the record contains evidence which would authorize a jury's finding that Equitable interfered with McLane's employment contract and frustrated her ability to earn a commission for ACOG's sixth lease amendment, the trial court erred in granting Equitable's motion for summary judgment with regard to McLane's claim that Equitable interfered with her employment contract and frustrated her ability to earn a commission for ACOG's sixth lease amendment. See *Christopher Investment Properties v. Cox*, 219 Ga. App. 440, 442 (1), 443, supra.

6. The trial court erred in granting the broker's and Equitable's motion for summary judgment with regard to McLane's OCGA § 13-6-11 claim for attorney fees and expenses of litigation. The trial court also erred in granting the broker's and Equitable's motion for summary judgment with regard to McLane's punitive damages claim. These questions are generally for the factfinder, not the trial court upon summary adjudication. *Rossee Oil Co. v. BellSouth Telecommunications*, 212 Ga. App. 235, 236 (441 SE2d 464); *Christopher Investment Properties v. Cox*, 219 Ga. App. 440, 443 (2), 444, supra.

*Judgment affirmed in part and reversed in part. Ruffin, J., concurs. Johnson, J., concurs in the judgment only.*

### APPENDIX.

"[APPELLEES' ATTORNEY:] In all the time that you were employed by AMC, did you ever become aware of any bonus or commission payments made to leasing agents of AMC in which AMC, in turn, did not receive compensation from Equitable or from the Inforum Associates which was the owner of the building? [LAURA J. McLANE:] I'm not familiar with any. Q. Did Brian [Hogg] ever tell you that he thought your right to any bonus or commission on the ACOG lease was independent of AMC's recovery of its bonus or com-

---

McLane's conspiracy theory against Equitable. See *U3S Corp. of America v. Parker*, 202 Ga. App. 374, 379 (3) (414 SE2d 513).

mission from Equitable? A. Did he ever tell me if it was independent? Q. Yes. Did it depend on AMC being compensated? A. I don't believe so. Q. So you are saying that he never told you either way, either it was or was not dependent on AMC being compensated by Equitable? A. No. His position was always that the monies were owed to me and he took the stance that the Market Center owed me the monies from our initial conversations. Q. Didn't he tell you that he was going to do his best to get the money from Equitable and pay you if he got it? A. To the best of my recollection that theory came from the letters, and Brian and I discussed those. I don't recall Brian presenting that concept. Q. The way you understood Brian, you thought that he was going to work within AMC to get you the money you said you were entitled to regardless of whether AMC was able to get that money from Equitable? A. As a leasing director I was not privy to any agreements between the Market Center and Equitable. So every conversation I had with Brian or the Market Center was that the commissions were owed me. I had no knowledge before seeing this agreement here what their arrangement awas [sic]. Q. By this agreement, you mean the [January 1, 1993,] management agreement [settling the broker's commission dispute with the property owners]? A. Correct. Q. When Jim Kranzusch explained your compensation structure to you when you became a leasing director, he did not tell you that AMC would pay you a commission or bonus if AMC was not paid a commission or bonus for that same lease by Equitable, did he? A. Could you repeat that? Q. Yes. At the time Jim Kranzusch had his discussion with you about your compensation arrangement as a leasing director, he did not tell you that you would be paid a bonus or a commission on new leases regardless of whether AMC received compensation from Equitable for that new lease, did he? A. He did not mention any stipulations. The only discussion was my payment of commissions. He didn't state it one way or the other. Q. Do you recall his stating that at some time you became a leasing agent or a leasing director? A. My conversations with Jim were prior to my accepting the task of leasing director. So upon discussing that with him, we shook hands on our agreement which was salary plus commission and then I joined the leasing team. Q. After you accepted being a leasing director, do you recall anyone at AMC saying whether or not a leasing director's commission or bonus would be tied to a corresponding payment by the building owner to AMC? A. There was never any reference to that whatsoever. Q. One way or the other? A. No. I was never privy to any agreement between the Market Center and Equitable other than there was a management contract between the two parties. Q. But you were never told either that your bonus or commission was or was not tied to AMC's right to get a bonus or commission from the owner?

A. Either way it was not addressed. The subject just was never discussed."

DECIDED MARCH 5, 1997 —
RECONSIDERATION DENIED APRIL 1, 1997 —

*James L. Ford, Sr., Terry D. Jackson,* for appellant.
*Schnader, Harrison, Segal & Lewis, C. Wilson DuBose, Mary A. Hall, Dionna K. Rutkowski,* for appellees.