A97A1665. CUMBERLAND CENTER ASSOCIATES
v. SOUTHEAST MANAGEMENT & LEASING CORPORATION.
A97A1666. SPRINT COMMUNICATIONS COMPANY
v. SOUTHEAST MANAGEMENT & LEASING CORPORATION.
A97A1667. SOUTHEAST MANAGEMENT & LEASING
CORPORATION v. CUMBERLAND CENTER ASSOCIATES.
(492 SE2d 546)

JOHNSON, Judge.

These three appeals arise out of a dispute over a real estate commission.

Cumberland Center Associates (hereinafter "Cumberland Center") owns an Atlanta office building that was largely vacant in 1985. At that time, Sprint Communications Company (hereinafter "Sprint") was looking for office space in Atlanta and hired Southeast Management & Leasing Corporation (hereinafter "Southeast") to help with the search. Sprint and Southeast agreed that if Sprint leased office space in Atlanta, Southeast would receive compensation from the landlord of the leased premises. Thereafter, Southeast contacted Cumberland Center and negotiated for Sprint to become the major tenant of Cumberland Center's office building. Sprint's tenancy was memorialized in 1985 by a lease agreement for a term of ten years (hereinafter "the 1985 lease").

Cumberland Center orally agreed to pay Southeast a market

rate commission equal to two months' rent and a five percent annuity for the rent it received from Sprint. Shortly after the 1985 lease was signed, Southeast attempted to memorialize the commission agreement in writing and sent a proposed agreement to Cumberland Center. However, Cumberland Center refused to sign the written proposal because it disputed that Southeast was entitled to receive a five percent annual commission "in perpetuity" and objected to the "global" proposal submitted by Southeast. Even though no written agreement was signed, Cumberland Center paid Southeast the two months' rent and five percent commission from 1985 through 1990.

In 1989, Sprint was negotiating on its own with Cumberland Center regarding the possible lease of an additional office building owned by Cumberland Center. At the same time, Cumberland Center sent a letter to Southeast concerning the finalization of a written commission contract. Southeast and Cumberland Center executed a written commission agreement dated December 20, 1990 (hereinafter "Commission Agreement"). Southeast contends that Cumberland Center demanded it sign the Commission Agreement on threat that it would stop paying the five percent commission if Southeast refused. Southeast further contends that Cumberland Center added no consideration not already due under the alleged oral agreement and that the sole modifications to the alleged oral agreement were to reduce the amount of commission due Southeast after year 15 and to add certain restrictions to the collection of the commissions. Nevertheless, the written Commission Agreement was signed by both parties, and Cumberland Center paid Southeast commissions under the agreement from 1990 through 1994.

The written Commission Agreement (a) gave Southeast a five percent commission for rent Sprint paid on "the initial premises plus all expansions during said initial term" and "all renewals and extensions of the initial term" up to the year 2000; (b) reduced Southeast's commission to two and one-half percent after the year 2000; (c) ended Southeast's commission entirely after the year 2010; and (d) provided that no commission would be payable to Southeast "for such periods of time as Sprint employs someone other than [Southeast] as the exclusive agent for Sprint in connection with the leasing of space by Sprint within the Building and [Cumberland Center] is required to pay rental commissions to such other exclusive agents of Sprint in connection with space leased to Sprint within the Building." The Commission Agreement further stated that "[u]pon the termination of the Lease or any additional or substitute lease agreement between [Cumberland Center] and Sprint with respect to space within the Building . . . then this Agreement shall terminate and [Cumberland Center] shall have no further obligations to [Southeast] hereunder for payments otherwise accruing after such termination."

In July 1993, with the 1985 lease set to expire in 1995, Sprint hired LaSalle Partners Management Limited Partnership (hereinafter "LaSalle") to begin looking for other possible rental locations in Atlanta. Cumberland Center began "open book" negotiations with LaSalle in an attempt to retain Sprint as a tenant. In a lease proposal sent to LaSalle, Cumberland Center stated as follows: "The original transaction broker was Southeast Management [which] is due a commission payable at 5% of the new net base rent ($12.60) through September 30, 2000 [sic] (81 months) payable on a monthly basis. . . . No commission is assumed payable on the existing unexpired term, operating expenses, nor for any term beyond fifteen years from the original commencement date." LaSalle informed Cumberland Center that Sprint was not interested in a renewal of the 1985 lease. Instead, in an effort to reduce costs, Sprint wanted to enter a new lease with terms and conditions different than those in the 1985 lease. Specifically, Sprint refused to enter into a lease that gave Southeast any commission and informed Cumberland Center that it did not believe Southeast would be entitled to any commission if a new lease was entered.

Accordingly, Cumberland Center eliminated the cost associated with Southeast's commission in its proposals. However, Cumberland Center believed that Sprint had an obligation to pay its former broker, Southeast, commissions related to the lease it was negotiating with Sprint and recognized the potential for litigation with Southeast. Sprint did not believe it had any liability for Southeast's commissions, but agreed to share the risk related to a possible claim by Southeast. Sprint and Cumberland Center entered into a new lease agreement dated August 12, 1994 (hereinafter "the 1994 lease"). Shortly after Cumberland Center and Sprint entered into the 1994 lease, they also entered into a Risk Sharing and Indemnity Agreement by which they agreed to share the costs related to a possible claim by Southeast for commission.

Cumberland Center acknowledges that the 1994 lease involved the same building space, the same landlord and the same tenant. However, it contends that the terms of the 1994 lease are materially different from the 1985 lease. Since both Cumberland Center and Sprint treated the 1994 lease as a "new" lease rather than a "renewal" or "extended" lease, they terminated the 1985 lease. In January 1995, Cumberland Center informed Southeast it would no longer pay Southeast commission payments. Southeast filed a broker's lien on March 30, 1995 in the amount of $995,321.49, which purportedly represented commission payments due from January 1995 through August 2000.

On May 12, 1995, Cumberland Center filed a complaint seeking a declaratory judgment that Southeast was not entitled to further

commissions and that its broker's lien was invalid, as well as asserting claims for slander of title, punitive damages and attorney fees. Southeast answered and counterclaimed for breach of the alleged oral commission agreement and breach of the 1990 written Commission Agreement, seeking damages under the theories of procuring cause, quantum meruit, unjust enrichment, conspiracy to deprive Southeast of a commission, and requesting perfection of its broker's lien and attorney fees. Southeast named Sprint and others as additional defendants in its counterclaim, specifically claiming Sprint wrongfully interfered with the Commission Agreement between Southeast and Cumberland Center and was a member of the conspiracy to defraud Southeast of its broker's commission.

Cumberland Center, Southeast and Sprint moved for summary judgment. In a single order, which does not provide findings of fact or conclusions of law, the trial court: (a) granted summary judgment to Cumberland Center on Southeast's counterclaims for breach of the alleged oral commission agreement, unjust enrichment, and theories of procuring cause and quantum meruit; (b) granted summary judgment to Southeast on its counterclaim for breach of the 1990 written Commission Agreement; and (c) denied summary judgment to Sprint on Southeast's claims for tortious interference and conspiracy. We will deal with the claims in this order.

"To prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law. OCGA § 9-11-56 (c)." *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991).

## Case No. A97A1667

In this case, Southeast contends the trial court erred in (a) denying it summary judgment and granting Cumberland Center partial summary judgment as to Southeast's claim for breach of the alleged oral agreement; (b) entering partial summary judgment in favor of Cumberland Center as to Southeast's claims for unjust enrichment and quantum meruit; and (c) entering partial summary judgment in favor of Cumberland Center as to Southeast's claim for commissions under the theory of procuring cause. For reasons which follow, we affirm the trial court's rulings in this case.

1. The trial court properly granted Cumberland Center's motion for partial summary judgment on the alleged oral agreement relating to Southeast's commissions. It is well-established that a contract does not exist unless the parties agree on all material terms. OCGA § 13-3-2. A contract cannot be enforced if its terms are incomplete,

vague, indefinite or uncertain. *Bagwell-Hughes, Inc. v. McConnell*, 224 Ga. 659, 662 (164 SE2d 229) (1968). In addition, "[t]he party asserting the existence of a contract has the burden of proving its existence and its terms. [Cit.]" *Casper v. Harrison Hatchery*, 172 Ga. App. 35, 36 (321 SE2d 785) (1984). This proof must be clear and convincing. *Hudson v. Venture Indus.*, 243 Ga. 116, 117 (252 SE2d 606) (1979).

We agree with the trial court that Southeast's evidence failed to show the formal requisites of an explicit oral contract between the parties. While the parties agreed that Southeast would receive a double procurement fee and five percent of the rent generated from Sprint, the parties clearly did not reach an agreement as to how long Southeast would receive the five percent commission or as to the breadth of the five percent commission if Sprint were to expand into the same or other buildings owned by Cumberland Center. This lack of agreement is evidenced by the two proposals drafted by the parties.

Southeast's initial proposal, rejected by Cumberland Center, provided that Southeast would be paid "in perpetuity" a five percent commission under the 1985 lease, any new lease, and all amendments, additions, holdovers, assignments, subleases, extensions or renewals of the lease or new leases and that Southeast would be paid its five percent commission so long as Sprint and Cumberland Center maintained a landlord/tenant relationship, whether related to the leased premises or any other premises. In 1989, Cumberland Center, attempting to finalize the terms of the agreement, wrote the following to Southeast in its proposal: "What we lack is to agree and settle on what that agreement is." Thereafter, the two parties signed the 1990 written Commission Agreement. Smith, Southeast's president, concedes he read the Commission Agreement, understood it and signed it.

Contrary to Southeast's contentions, it is clear that no oral contract existed prior to the 1990 written Commission Agreement. While Cumberland Center agreed that Southeast was due a two months' procurement fee and five percent of the rent generated by Sprint during the initial ten year lease signed in 1985, and voluntarily paid these amounts, it continuously denied that Southeast was due any commissions "in perpetuity" or for space Sprint may have rented from Cumberland Center in different office buildings. Without any agreement as to the duration or breadth of the payments due Southeast, we cannot find that an oral contract existed between Southeast and Cumberland Center. This being the case, no new consideration was necessary for the 1990 written Commission Agreement since it was the first embodiment showing an agreement on all material terms and because it specifically stated that it was being entered "in

consideration of services rendered by [Southeast in procuring the 1985 lease] and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged. . . ."

The fact that Cumberland Center made voluntary commission payments and agreed that an agreement had been reached regarding some of the terms does not cure the deficiencies of the alleged oral agreement because "the agreement relied upon was so vague, indefinite and uncertain 'as to make it impossible for courts to determine what, if anything, was agreed upon . . .' [cit.]" with respect to the duration and breadth of the alleged oral commission agreement. *McConnell,* supra. "A court will not carry a contract into effect where it is left to ascertain the intention of the parties by mere guess or conjecture. [Cit.]" *Hughes v. McMichen,* 164 Ga. App. 304, 305 (296 SE2d 233) (1982). In the present case, the duration and breadth of any agreement between Cumberland Center and Southeast cannot be said to be "nonessential boilerplate that would rarely be discussed, much less negotiated," but were essential terms upon which the parties needed to agree before a contract existed. See *Toncee, Inc. v. Thomas,* 219 Ga. App. 539, 542 (2) (466 SE2d 27) (1995).

"Clearly the requisites of an explicit contract, such as a meeting of the minds of the parties, mutuality, and the clear expressions of the terms of an agreement, are absent here. [Cit.]" *Casper,* supra. Under the circumstances of this case, we conclude that no contested issues of material fact remain. Accordingly, we affirm the trial court's denial of summary judgment to Southeast and grant of partial summary judgment to Cumberland Center on Southeast's claim for breach of an alleged oral agreement.

2. Based on our ruling below in Case No. A97A1665, the written Commission Agreement is valid and binding in this case. Thus, as Southeast admits, Southeast's claims for damages based on the theories of unjust enrichment, quantum meruit, and procuring cause are not viable. Accordingly, we affirm the trial court's denial of summary judgment as to these claims.

### Case No. A97A1665

In Case No. A97A1665, Cumberland Center contends the trial court erred in granting Southeast's motion for summary judgment related to Southeast's claim for breach of the written Commission Agreement. According to Cumberland Center, it did not breach the written Commission Agreement because the 1994 lease was a new lease as a matter of law, rather than a renewal or extension of the 1985 lease, and, therefore, Southeast was not entitled to commission payments after the 1994 lease was executed. We disagree.

It is well-established that contract disputes are particularly well

suited for summary adjudication since construction of a contract is ordinarily a matter of law for the court. *Burns v. Reves*, 217 Ga. App. 316, 318 (1) (457 SE2d 178) (1995). Furthermore, "[i]f the contract does not require disentanglement of the language by a jury, i.e., the words used are plain and clear in their common usage, it remains the duty of the trial court to look to the language of the contract with a view to effectuating the intent of the parties. [Cits.]" *Bd. of Regents &c. v. A. B. & E., Inc.*, 182 Ga. App. 671, 673 (357 SE2d 100) (1987).

In the present case, the written Commission Agreement contemplated Southeast would receive a commission "with respect to the [1985] Lease and any *extensions, renewals* or *replacements* thereof. . . ." (Emphasis supplied.) The agreement stated that Southeast's services had been completed and Southeast had "no additional services to perform in connection with any renewal or extension of the Lease." It provided for a payment of five percent commission to Southeast "of all Base Rent . . . collected by [Cumberland Center] from Sprint during the initial term of the Lease, for the initial premises plus all *expansions* during said initial term, which five percent (5%) shall also be payable with respect to all *renewals* of the Lease to a maximum (i.e. the initial terms plus all *renewals* and *extensions* of the initial term) of fifteen (15) years." (Emphasis supplied.) The agreement reduced Southeast's commission to two and one-half percent after the year 2000 and ended Southeast's commission entirely after the year 2010; "provided, however, that extended commissions . . . shall not be due and payable to [Southeast] (i) for such periods of time as Sprint employs someone other than [Southeast] as the exclusive agent for Sprint in connection with the leasing of space by Sprint within the Building and [Cumberland Center] is required to pay rental commissions to such other exclusive agents of Sprint in connection with space leased to Sprint within the Building." The Commission Agreement further stated that "[u]pon the termination of the Lease or any additional or *substitute* lease agreement between [Cumberland Center] and Sprint with respect to space within [the] Building, whether such termination is voluntary or involuntary . . . then this Agreement shall terminate and [Cumberland Center] shall have no further obligations to [Southeast] hereunder for payments otherwise accruing after such termination." (Emphasis supplied.)

We find the written agreement is clear and unambiguous. The fact that the agreement uses the term "renewal" rather than "new lease" is not dispositive of the issue. Indeed, a number of cases have held that these terms are synonymous in that a renewal may require a new document and that the parties' characterization of the document is not controlling. See, e.g., *Crystal Blue Granite Quarries v. McLanahan*, 261 Ga. 267 (1) (404 SE2d 266) (1991); *Bd. of Regents*,

supra at 673-674. "In deciding whether a succeeding lease is substantially a renewal of a preceding lease or altogether a new lease, the determination can be based on whether the succeeding lease employs drastically different terms, not simply somewhat different considerations, i.e., is the lessee occupying substantially the same space under substantially the same terms? If the succeeding lease employs substantially the same terms as the preceding lease, it may be considered a renewal even though technically a 'new' lease. [Cit.]" *Bd. of Regents*, supra at 674.

An examination of the 1985 and 1994 leases reveals that Sprint was occupying the same space under substantially the same material terms.[1] Although the 1994 lease is a "net lease," where the tenant pays as part of rent a pro rata share of the actual operating expenses related to the subject property, and the 1985 lease is a "gross lease," the substantive effects are minor. The essential elements of the leases are the same: Both leases are between the same parties; both cover the same space; and both are for the same purpose. The other peripheral matters do not change the essential elements or the essential nature of the continued tenancy. We find the 1994 lease does not reveal drastically different material terms which would create an issue of fact as to whether the lease was a renewal of the 1985 lease.

Moreover, the written Commission Agreement contemplates "substituted" or "replacement" leases. These terms "would embrace not only a renewal of the original lease on substantially the same terms, but a completely new agreement employing drastically different terms as well. . . ." *Hunter v. Benamy Realty Co.*, 115 Ga. App. 829, 831 (2) (156 SE2d 160) (1967). Even Cumberland Center, in proposing the changes which were later incorporated in the 1994 lease, described the proposal as follows: "to extend Sprint's lease term and recast the remaining term of the existing lease." In this same letter, Cumberland Center informed Sprint that Southeast, as the original transaction broker, was due a commission on the "new" lease.

Cumberland Center also argues that the trial court erred in granting Southeast's motion for summary judgment on this issue because the Commission Agreement terminated when Cumberland Center and Sprint terminated the 1985 lease. In support of this argument, Cumberland Center relies on the termination language in the Commission Agreement. This language follows a heading entitled

---

[1] The 1985 lease was amended and expanded several times as a result of Sprint's growth, and it is undisputed that, consistent with the Commission Agreement, Cumberland Center paid Southeast commission on the expansions. On October 1, 1993, Cumberland Center and Sprint entered into a lease for additional premises. References to the 1985 lease will include all expansions and amendments of it, including the 1993 lease.

"Cancellation of Lease." The only logical meaning of that language was that Cumberland Center was not obligated to pay Southeast commission payments under the Commission Agreement if the lease was terminated because Sprint stopped occupying the premises due to condemnation, breach of the lease, or other factors. "It is well established that a court should avoid an interpretation of a contract which renders portions of the language of the contract meaningless. [Cits.]" *Bd. of Regents*, supra at 675.

We are satisfied that the trial court properly effectuated the intent of the parties by construing the word "renewal" to encompass the new lease entered into between Cumberland Center and Sprint in 1994 and thus requiring Cumberland Center to continue paying commissions to Southeast pursuant to the 1990 Commission Agreement. Thus, we find no error in the grant of summary judgment to Southeast on this issue.

### Case No. A97A1666

In this case, Sprint contends the trial court erred in denying its motion for summary judgment on Southeast's claims for conspiracy and tortious interference with contractual relationship, and in granting Southeast partial summary judgment on its breach of contract claim relating to the 1990 Commission Agreement. We disagree and affirm both rulings.

3. In its first enumeration of error, Sprint contends it is entitled to summary judgment on Southeast's tort claims because it did not act maliciously and did not procure any alleged breach of the Commission Agreement.

(a) Southeast's conspiracy theory is based on Sprint's alleged actions in influencing Cumberland Center not to honor its contractual obligation to pay Southeast commissions by agreeing to execute a new lease and terminate the existing lease. "Because civil conspiracy is by its very nature a secret endeavor, and thus rarely open to direct proof, concert of action, amounting to conspiracy, is best suited for jury resolution and may be proved by either direct or circumstantial evidence. In other words, it is unnecessary to prove an express compact among the alleged conspirators. A jury may infer a civil conspiracy from the nature of the alleged wrongdoers' acts, the relation between them, their mutual interests in the matter, and other circumstances. [Cit.]" *McLane v. Atlanta Market Center Mgmt. Co.*, 225 Ga. App. 818, 826 (4) (b) (486 SE2d 30) (1997).

According to the record, Cumberland Center acknowledged its contractual obligation to Southeast for commission payments. In fact, in its original lease proposal sent to LaSalle, Cumberland Center specifically noted that Southeast, the original transaction broker,

was entitled to a five percent commission through September 30, 2000. Throughout negotiations with Sprint, Cumberland Center believed that Sprint was obligated to pay its former broker and recognized the potential for litigation with Southeast, ultimately requiring Sprint to sign a Risk Sharing and Indemnity Agreement shortly after entering into the 1994 lease. However, according to Cumberland Center, Sprint refused to enter into a lease that gave Southeast any commission, and Cumberland Center needed to extend Sprint's lease to refinance the building.

After reviewing the 1990 Commission Agreement, Sprint wrote a letter to Cumberland Center indicating its displeasure that Southeast had received continuous commission payments. In part, the letter stated as follows: "It is particularly disturbing that as a component of Sprint's base rent, Southeast Management was compensated even though this firm provided no brokerage services relating to . . . expansions. This unjust compensation is not what we would expect from an established firm such as your client. . . ." The letter also expressed Sprint's dissatisfaction with Cumberland Center's payment of $600,000 to Smith, Southeast's president, for consultation services related to Sprint's rental of another office building owned by Cumberland Center. According to Sprint, "[a]nswers to the above issues are imperative to [Cumberland Center's] relationship with its largest tenant" and directed that Sprint "would like to discuss how [Cumberland Center] proposes to justly compensate Sprint for these broker commission issues."

Sprint wrote an additional letter informing Cumberland Center that it did not believe Southeast would be entitled to any commission if the 1985 lease was terminated and a new lease was executed. According to Cumberland Center, "[t]his letter marks the point where we realize that the approach we were taking with Sprint was going to be unacceptable to Sprint. The approach we had been taking was to pursue a renewal of the lease which incorporated, you know, various provisions that we had proposed and had incorporated the payment of Southeast Management a fee and at this point it became — this was kind of the point where if we were going to do something on this deal, that we had to take a different — we had to listen to Sprint and respond to their request for a different real estate structure than the track we were headed."

Cumberland Center testified that Sprint refused to renew the 1985 lease or enter into any lease that gave Southeast a commission. "Sprint was phrasing it we're not doing a renewal. Mac Smith is not representing us in a new transaction. Lasalle is. If you want to pursue the deal with us, that's the deal you can pursue, but we're not pursuing the course you're on which is a renewal of the old lease."

Thereafter, Cumberland Center eliminated the cost associated

with Southeast's commissions in its proposals and both Cumberland Center and Sprint treated the 1994 lease as a new lease rather than a renewal. The parties mutually agreed to terminate the 1985 lease and execute another document for the lease of the same space. Cumberland Center even changed language in a press release to "suggest that the release read as a *new* lease rather than a renewal. . . ." (Emphasis in original.)

We find that this evidence in the record raises genuine issues of material fact as to Southeast's claim that Sprint conspired with Cumberland Center to deprive Southeast of a commission for Sprint's "new" lease in 1994. *Kenimer v. Ward Wight Realty Co.*, 109 Ga. App. 130 (135 SE2d 501) (1964), relied upon by Sprint, is distinguishable. A reading of the *Kenimer* opinion does not reveal any evidence of conspiracy or evidence that a third party suggested or encouraged that the management agreement be terminated and a new agreement entered. In the present case, there is evidence in the record from which a jury could find conspiracy. While *Kenimer* suggests that Sprint and Cumberland Center may have been justified in rescinding the 1985 lease, they may not do so as a ploy to deprive a broker of his commission. Accordingly, the trial court did not err in denying Sprint's motion for summary judgment on this issue.

(b) In its claim for tortious interference with contractual relationship, Southeast contends Sprint interfered with its contractual rights under the 1990 Commission Agreement and frustrated its ability to earn a commission for Sprint's "new" lease. "Tortious interference with contract requires proof of: (1) an independent wrongful act of interference by a stranger to the contract; (2) malicious intent to cause injury; and (3) resulting damage. Malice, as herein used, is a term to be given a liberal meaning; malicious or maliciously means any unauthorized interference, or any interference without legal justification or excuse." (Citations and punctuation omitted.) *McLane*, supra at 827 (5).

According to Sprint, it cannot be responsible for unlawfully depriving Southeast of commission payments since Sprint merely exercised its unqualified legal right to negotiate and enter into a new lease with Cumberland Center. However, the real issue is not whether Sprint had a legal right to enter into the 1994 lease, but whether Sprint unlawfully interfered with Southeast's contractual right to commission payments stemming from Cumberland Center's 1985 lease with Sprint. Evidence that Sprint influenced Cumberland Center into not honoring its contractual obligation to pay Southeast commissions for Sprint's "new" lease in 1994 raises a question for consideration by a jury that Sprint maliciously interfered with Southeast's right to commission payments under its contract with Cumberland Center. Id. Because questions of material fact exist, we

affirm the trial court's ruling denying Sprint's motion for summary judgment on this issue.

4. Sprint's second enumeration of error is without merit for the reasons discussed in Case No. A97A1665.

*Judgment affirmed. Pope, P. J., and Blackburn, J., concur.*

DECIDED SEPTEMBER 19, 1997 —

*Paul, Hastings, Janofsky & Walker, John G. Parker, Joseph C. Sharp*, for Cumberland Center Associates.

*Smith, Gambrell & Russell, Edward H. Wasmuth, Jr., Mark W. McGrory, Charles J. Hyland*, for Sprint Communications Company.

*Morris, Manning & Martin, Warren W. Wills, Jr., Ann R. Schildhammer*, for Southeast Management & Leasing Corporation.