A97A2367. STRAHLEY v. PRUITT CORPORATION.
(498 SE2d 78)

RUFFIN, Judge.

David Strahley sued Pruitt Corporation[1] ("Pruitt") alleging tortious interference with contractual and business relationships. The trial court granted Pruitt summary judgment on both claims. Strahley appeals, and for reasons which follow we affirm the grant of summary judgment on Strahley's tortious interference with business relations claim, but reverse the court's judgment on his interference with contract claim.

"To prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law. OCGA § 9-11-56 (c). A *defendant* may do this by showing the court that the documents, affidavits, depositions and other evidence in the record reveal that there is no evidence sufficient to create a jury issue on at least one essential element of plaintiff's case. . . . A defendant who will not bear the burden of proof at trial need not affirmatively disprove the nonmoving party's case; instead, the bur-

---

[1] The pleadings and evidence of record include two different spellings of defendant corporation: "Pruit" and "Pruitt." For consistency, we will utilize the latter spelling which was employed by the parties in their appellate briefs and by this Court in docketing the appeal.

den on the moving party may be discharged by pointing out by reference to the affidavits, depositions and other documents in the record that there is an absence of evidence to support the nonmoving party's case. If the moving party discharges this burden, the nonmoving party cannot rest on its pleadings, but rather must point to specific evidence giving rise to a triable issue. OCGA § 9-11-56 (e)." *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991).

In this case, Strahley alleged that Pruitt operated nursing homes and that he provided psychological counseling to residents of the nursing homes. According to Strahley's complaint, Pruitt denied him "the right to see patients and conduct his business." Strahley claimed that Pruitt's conduct gave rise to his two causes of action.

Viewed in a light most favorable to Strahley, the evidence of record shows that Pruitt owned and operated the Fort Oglethorpe Nursing Center ("Fort Oglethorpe") located in Fort Oglethorpe, Georgia and the Shepherd Hills Health Care Center ("Shepherd Hills") in Lafayette, Georgia. In August 1993, Fort Oglethorpe and Shepherd Hills entered into one-year contracts with Strahley for him to provide various psychological counseling services to residents of both facilities.[2] The evidence is undisputed that both Pruitt facilities utilized Strahley as required during the terms of the contracts. Although there were no written extensions or renewals, Strahley continued to provide his services after the contracts expired.

According to the affidavit of Steve Sheets, Shepherd Hills' administrator, Strahley continued providing his services at that facility through August 5, 1996, "when he stopped coming after he was notified that the Contract was being terminated." Sheets further stated that "Strahley gave no notice to [him] nor anyone on the staff at [Shepherd Hills] that he would not be returning to provide psychological services when he left the facility on or about Monday, August 5, 1996." The affidavit of Alan Hutchins, Fort Oglethorpe's administrator, indicates that Strahley's services were also terminated at that facility in the fall of 1996. According to Hutchins' affidavit, "[i]n accordance with the notice sent to his attorney, Dr. Strahley simply stopped coming to [Fort Oglethorpe] after November 8, 1996." Both Sheets and Hutchins testified that after Strahley left the facilities, neither the residents whom Strahley was treating nor their families ever asked where he was or further requested his services.

In response to this evidence, Strahley pointed to interrogatory responses in which he stated that he had contractual relationships with his patients who resided at the nursing homes. According to the

---

[2] Strahley provided services and entered the contracts under the name Professional Psychological Services.

discovery responses, representatives from both facilities "severely limited" his access to his patients and informed him in February 1996 that he would no longer be permitted to provide psychological services to the patients.

1. " 'Tortious interference with contract requires proof of: (1) an independent wrongful act of interference by a stranger to the contract; (2) malicious intent to cause injury; and (3) resulting damage.' " *Cumberland Center Assoc. v. Southeast Mgmt. &c.*, 228 Ga. App. 571, 581 (3) (b) (492 SE2d 546) (1997). In this case, Pruitt contends that summary judgment was properly granted because it was not a stranger to Strahley's contracts with the facilities or its patients.

We agree with Pruitt that the foregoing evidence failed to establish it was a stranger to the contracts between Strahley and the nursing homes. The evidence clearly shows that Pruitt owned and operated both facilities. A more difficult question, however, is whether Pruitt was a stranger to the contracts between Strahley and his patients residing at the facilities.

In support of his assertion that Pruitt was a stranger to his contracts with the residents, Strahley cites the Bill of Rights for Residents of Long-term Care Facilities, OCGA § 31-8-100 et seq. ("Bill of Rights"). The Bill of Rights is based upon a finding by the General Assembly that "persons residing within long-term care facilities are isolated from the community and often lack the means to assert fully their rights as individual citizens." OCGA § 31-8-101. Accordingly, in promulgating the Bill of Rights, it was "the intent of the General Assembly to preserve the dignity and personal integrity of residents of long-term care facilities through the recognition and declaration of rights safeguarding against encroachments upon each resident's need for self-determination." Id. It is clear, that in light of this legislative intent, the General Assembly has attempted to carefully balance the duties placed on long-term care facilities regarding the required care of their residents and the rights of the residents to act autonomously. For example, OCGA § 31-8-108 requires a facility to provide adequate and appropriate care, treatment and services to its residents, but allows the residents to choose their own physician and participate in planning their health care. Similarly, OCGA § 31-8-111 requires the assistance of the facility in promoting a resident's rights to vote, freely exercise religion and associate with others. Finally, OCGA § 31-8-120 (a) requires that "[v]isitors must be granted access to residents, who have the right to refuse or terminate any visit." A facility administrator may refuse a visitor access or require a person to leave "only if he has reason to believe that the presence of the person seeking access would result in severe harm to any resident's health, safety, or property; if the access is sought for financial solicitation or for commercial purposes; or if such access is

refused by the resident." OCGA § 31-8-120 (c).

We agree with Pruitt that the relationship between an independent care provider, a resident and the facility is at times such that the parties are "inextricably bound together." This is necessitated by the requirement that the facility provide its residents with "care, treatment and services which are adequate and appropriate." OCGA § 31-8-108 (a). However, this requirement must be read within the context of the legislative intent of "safeguarding against encroachments upon each resident's need for self-determination[,]" and providing residents with "the means to assert fully their rights as individual citizens." OCGA § 31-8-101. See also OCGA § 1-3-1 (a) ("In all interpretations of statutes, the courts shall look diligently for the intention of the General Assembly, keeping in view at all times the old law, the evil, and the remedy."). Accordingly, although OCGA § 31-8-108 only addresses a resident's rights to choose a physician and pharmacist, we do not believe that the Legislature intended to restrict a resident to selecting only a physician and pharmacist. If it were true that a facility could, without reprisal, freely interfere with all other contractual relationships relating to the care of its residents, the same residents' rights of self-determination and association would be severely jeopardized in violation of the Bill of Rights.[3] Thus, although Pruitt had an obligation to provide adequate and appropriate care to the residents under OCGA § 31-8-108, this obligation did not necessarily entitle the nursing homes to interfere with the autonomous contractual relationships of its residents.

In this regard, the evidence shows that Strahley's written contract with Pruitt's facilities expired and that he had separate contractual relationships with residents of those facilities. A jury could find that these latter contractual relationships were intended to be completely independent of any affiliation the residents had with the nursing homes and that the facilities accordingly had no right to interfere with those contractual relationships. These are indeed murky waters which, under the circumstances of this case, are not susceptible to resolution by a court as a matter of law. The issue of whether Pruitt, as the owner of the facilities, was a stranger to any contracts Strahley had with residents is a matter that must be decided by a jury. See *McLane v. Atlanta Market &c. Co.*, 225 Ga. App. 818, 827 (5) (486 SE2d 30) (1997) (physical precedent only). We therefore reverse the trial court's grant of summary judgment to

---

[3] We do not address the issue of whether a facility administrator has the right to interfere with a resident's independent contractual relationship if the administrator has reason to believe that the relationship would "result in severe harm to [the] resident's health, safety, or property; if the access is sought for financial solicitation or for commercial purposes; or if such access is refused by the resident." OCGA § 31-8-120 (c).

Pruitt on Strahley's tortious interference with contract claim.

2. We disagree with Strahley, however, that the trial court erred in granting Pruitt summary judgment on his tortious interference with business relations claim. "To recover under a theory of tortious interference with business relations, [Strahley] must demonstrate financial injury and must show that [Pruitt]: acted improperly and without privilege; acted purposely and with malice with intent to injure; and induced a third party or parties not to enter into or continue a business relationship with [Strahley]. [Cit.]" *Keith v. Alexander Underwriters &c.*, 226 Ga. App. 838, 840-841 (3) (487 SE2d 673) (1997). Pruitt asserts that summary judgment was appropriate because there was no evidence that it induced the residents not to enter into or continue a business relationship with Strahley. We agree.

Pruitt has shown that after Strahley left the facilities, neither the residents whom Strahley was treating nor their families ever asked where he was or further requested his services. Pruitt has further shown that there is no evidence that it induced the residents or the residents' representatives to discontinue a business relationship with Strahley. In response, Strahley was required to point to specific evidence giving rise to a triable issue. See *Lau's Corp.*, supra. Because Strahley failed to point to any such evidence, the trial court properly granted summary judgment to Pruitt on this claim. See id.

*Judgment affirmed in part and reversed in part. Birdsong, P. J., and Eldridge, J., concur.*

DECIDED FEBRUARY 17, 1998 —
RECONSIDERATION DENIED MARCH 24, 1998 ▮▮▮▮▮▮▮▮

*Robert D. Jones*, for appellant.

*Adams, Clifton, Sanders & Smith, Cecil L. Clifton, Jr.*, for appellee.