S97G1229. ATLANTA MARKET CENTER MANAGEMENT COMPANY et al. v. McLANE et al.
S97G1239. EQUITABLE REAL ESTATE INVESTMENT MANAGEMENT, INC. et al. v. McLANE et al.
(503 SE2d 278)

BENHAM, Chief Justice.

We granted certiorari to the Court of Appeals to examine its opinion in a case involving a number of contractual relationships wherein the appellate court reversed a portion of the trial court's grant of summary judgment to Atlanta Market Center Management (AMC) and Equitable Real Estate Management and others (Equitable). *McLane v. Atlanta Market &c.,* 225 Ga. App. 818 (486 SE2d 30) (1997).

In 1987, AMC executed a written contract whereby AMC obtained the exclusive right to lease the Inforum, a downtown Atlanta building owned by a partnership, the managing partner of which was the owner of Equitable Real Estate. It was agreed that AMC was to be paid a bonus commission for every square foot of space which a new or existing tenant leased in the Inforum. In 1990, AMC made its at-will employee, appellee Laura McLane, a "leasing director" for the Inforum, assigned several tenant accounts to her, and orally agreed to pay her a bonus commission for each square foot of Inforum space leased to her Inforum tenants. A portion of the bonus was to be paid upon the execution of the lease, and the remainder of the bonus payable upon the tenant's occupation of the space. The AMC-McLane oral agreement had no provision concerning whether the bonus commission would be paid should McLane's at-will employment be terminated before the occurrence of the conditions precedent to payment.

In 1991, the Atlanta Committee for the Olympic Games (ACOG) occupied space in the Inforum through a lease which contained several expansion options. The ACOG account was assigned to McLane

who serviced the account through ACOG's exercise of its expansion rights under the 1991 lease and received a bonus commission after each expansion. In July 1992, ACOG notified McLane and AMC that it wished to lease more Inforum space. When Equitable became aware of ACOG's interest in expanding its Inforum presence, Equitable entered into direct negotiations with ACOG concerning the proposed expansion and informed AMC that its Inforum management agreement would not be renewed after it expired on October 11, 1992. Equitable later extended the AMC management agreement through October 1992, and agreed to pay bonus commissions to AMC for those leases with certain specified tenants negotiated during the management agreement so long as the leases went into effect by December 31, 1992. ACOG was not one of the specified tenants and its lease for the expanded area was not executed until February 18, 1993, well after the October 31 expiration of the management agreement extension and the December 31 deadline. No commission was paid to AMC or McLane upon ACOG's execution of the lease expansion or upon its occupation of the newly-leased space.

With the loss of the Inforum management contract, AMC terminated McLane's employment on October 31, 1992. Knowing that McLane had refused a severance package offered by AMC because it had not included payment of a bonus commission for the 1993 ACOG expansion, AMC promised McLane it would pay her a portion of any commission it received from Equitable as a result of ACOG's 1993 expansion. Despite the loss of its Inforum management contract, AMC continued to manage a smaller portion of the Inforum and executed a new management contract with Equitable covering the more limited area on February 26, 1993. In that written agreement, AMC acknowledged that it had been paid all amounts owed it under the old agreement and that it was not entitled to any further payments thereunder. AMC also agreed to indemnify and hold Equitable harmless from any claim asserted against Equitable by any present or former employee of AMC arising out of the earlier management agreement.

Shortly thereafter, McLane filed suit against AMC and Equitable, contending she was entitled to a commission for the 1993 ACOG expansion and that AMC had broken its promise to protect her commission rights and had breached its fiduciary responsibility to her by entering into a deal with Equitable which resolved the commission claim to McLane's detriment. She alleged that Equitable had tortiously interfered with her employment contract with AMC when it violated the Inforum management agreement by negotiating the 1993 ACOG lease expansion itself. McLane also sought punitive damages, attorney fees, and expenses of litigation. The trial court granted the defendants' joint motion for summary judgment. The

Court of Appeals reversed that judgment, holding that McLane was entitled, as a matter of law, under her oral agreement with AMC to a commission of $246,618 for the 1993 ACOG lease amendment, and that AMC had breached its fiduciary responsibility to fully compensate McLane and to protect her commission rights during AMC's negotiations with Equitable. The appellate court also found genuine issues of material fact concerning Equitable's liability for allegedly conspiring with AMC to deprive McLane of the commission (225 Ga. App. 818 at Division 4 (b)); and found sufficient evidence from which a jury could conclude that Equitable had tortiously interfered with McLane's efforts to procure the 1993 ACOG expansion lease pursuant to the terms of her employment contract with AMC, and that Equitable had interfered with McLane's right to receive compensation under her employment contract for the 1993 ACOG lease. The Court of Appeals rejected Equitable's assertion that it could not be liable for tortious interference with McLane's contract because it was not a stranger to the contract. 225 Ga. App. at 828. This Court granted the petitions for certiorari filed by AMC and Equitable, and expressed interest in the extent to which an employer owed a terminable-at-will employee a fiduciary duty under Georgia law, and the scope of the "stranger doctrine" in the law of tortious interference with contractual relations.

1. Fiduciary duties and obligations are owed by those in confidential relationships, i.e., relationships "where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc." OCGA § 23-2-58. The Court of Appeals ruled that AMC, "as a real estate professional and employer, had a fiduciary obligation to compensate McLane and to protect her during the parties' agency relationship" (225 Ga. App. at 825), implicitly finding that AMC and McLane enjoyed a principal-agent relationship or a confidential relationship arising out of their employer-employee relationship. We address each implicit finding seriatim.

(a) An agency relationship arises "wherever one person, expressly or by implication, authorizes another to act for him. . . ." OCGA § 10-6-1. In order for McLane to serve as AMC's agent, she had to be more than the employee delegated by AMC to look after certain accounts — she had to be "vested with authority, real or ostensible, to create obligations on behalf of [AMC], bringing third parties into contractual relations with [AMC]." *Southeastern Fidelity Ins. Co. v. Heard*, 123 Ga. App. 635 (3) (b) (182 SE2d 153) (1971). There is no evidence that McLane was authorized to obligate AMC by entering into contracts on behalf of AMC; in fact, she admitted in a

deposition that any leasing arrangement she might suggest had to meet with AMC's approval before AMC signed it. Therefore, we conclude that McLane failed to establish that she was AMC's agent.

There remains, however, the question whether AMC took on the role of acting as McLane's agent in its negotiations with Equitable concerning the 1993 ACOG expansion commission. AMC believed McLane's entitlement to a commission for the expansion was conditioned upon AMC's receipt of a commission from Equitable, and promised McLane it would pay her a commission upon the occurrence of that condition precedent. AMC then bargained away the condition precedent, effectively eviscerating McLane's receipt of a commission, in exchange for a written agreement whereby AMC continued to manage a smaller portion of the Inforum. However, there is no evidence that McLane authorized AMC to create obligations on her behalf during AMC's negotiations with Equitable. See id. Since it was not established that McLane acted as AMC's agent or that AMC acted as McLane's agent, there can be no breach of fiduciary relationship arising from a principal-agent relationship between the two.

(b) The Court of Appeals' opinion suggested that AMC might owe McLane a fiduciary obligation as her employer. The employee-employer relationship is not one from which the law will necessarily imply fiduciary obligations; however, the facts of a particular case may establish the existence of a confidential relationship between an employer and an employee concerning a particular transaction, thereby placing upon the parties the fiduciary obligations associated with a principal-agent relationship. *Cochran v. Murrah*, 235 Ga. 304, 307 (219 SE2d 421) (1975); *Remediation Services v. Georgia-Pacific Corp.*, 209 Ga. App. 427, 431-432 (433 SE2d 631) (1993). The Court of Appeals appears to have based its holding that AMC had a fiduciary duty as employer to fully compensate McLane and protect her commission rights on AMC's purported usurpation of a business opportunity assigned to McLane, and AMC's assurances to McLane that AMC would pursue its claim for a commission from the 1993 ACOG expansion and would pay McLane her share of any commissions received from Equitable. If, as McLane contends, the ability to negotiate the 1993 ACOG expansion was a business opportunity wrongfully taken from her, it was not taken by AMC, but by Equitable when it elected to negotiate with ACOG directly. The assurances relied upon by McLane were made by AMC to McLane a month after the employer-employee relationship had ended; while the assurances likely would not have been made but for the prior employer-employee relationship enjoyed by the parties, because they were not made while the employer-employee relationship existed, we decline to hold that the post-employment assurances retroactively caused the

employer-employee relationship to evolve into a fiduciary relationship between the parties. We conclude that the Court of Appeals erred when it ruled that the trial court should not have granted summary judgment to AMC and Equitable on McLane's claims of breach of fiduciary duties.

2. The Court of Appeals also reversed the trial court's grant of summary judgment to appellant Equitable on McLane's assertion that Equitable had tortiously interfered with McLane's contractual rights. Parties to a contract have a property right therein with which a third party cannot interfere without legal justification or privilege, and a party injured by another's wrongful interference may seek compensation in tort. *Luke v. Dupree*, 158 Ga. 590 (1) (124 SE 13) (1924); OCGA § 51-12-30. In order to prevail on a claim alleging tortious interference with contract, a plaintiff must establish the existence of a valid contract and that the defendant acted intentionally, without privilege or legal justification, to induce another not to enter into or continue a business relationship with the plaintiff, thereby causing the plaintiff financial injury. *Lake Tightsqueeze v. Chrysler First Fin. Svcs. Corp.*, 210 Ga. App. 178 (5) (435 SE2d 486) (1993). See also *Voyles v. Sasser*, 221 Ga. App. 305 (472 SE2d 80) (1996); *McDaniel v. Green*, 156 Ga. App. 549 (275 SE2d 124) (1980); Restatement, Second, Torts, § 766.[1]

After proving the existence of a contract, it is essential to a claim of tortious interference with contractual relations that the plaintiff establish that the defendant is a "third party," i.e., a "stranger" to the contract with which the defendant allegedly interfered. One is not a stranger to the contract just because one is not a party to the contract, as it has been held that the alleged interferer is not a stranger to the contract and thus not liable for tortious interference where the alleged interferer was the agent for one of the parties to the contract of insurance (i.e., the underwriter), and all the purported acts of interference were done within the scope of the interferer's duties as agent. *Jet Air v. Nat. Union Fire Ins. Co.*, 189 Ga. App. 399 (375 SE2d 873) (1988). See also *Hyre v. Denise*, 214 Ga. App. 552 (449 SE2d 120) (1994) (where the court ruled that an attorney who on behalf of a client asserts or prosecutes a claim arising from contractual rights or duties is not a stranger to the contract so that neither the attorney nor the attorney's partners may be held liable for tortious interfer-

---

[1] Because our concern in granting the petition for certiorari, as expressed in the questions posed therein, was in the applicability of the "stranger doctrine" to the facts of this case, we assume for purposes of this opinion, that McLane has established the existence of contractual rights and relations with which Equitable allegedly interfered (*McDaniel v. Green*, supra, 156 Ga. App. at 550), and that Equitable had no right to negotiate directly with ACOG.

ence); *Nexus Svcs. v. Manning Tronics*, 201 Ga. App. 255 (1) (410 SE2d 810) (1991) (where the alleged interferer was the corporate president of one of the contracting parties and all his purported acts of interference were within the scope of his corporate duties, he was not a stranger to the corporation's contract and thus was not liable for tortious interference). Similarly, a defendant averred to have been acting in an official capacity is not a stranger to an employment contract (*Johnson v. Rogers*, 214 Ga. App. 557 (3) (448 SE2d 710) (1994)), and neither is an employee's supervisor. *Hylton v. American Assn. for Vocational Instructional Materials*, 214 Ga. App. 635 (448 SE2d 741) (1994). The intended third-party beneficiary of a contract, legally authorized to enforce the contract, cannot be held liable for tortious interference since he is not a stranger to the contract. *Cohen v. William Goldberg & Co.*, 202 Ga. App. 172 (413 SE2d 759) (1991). The exclusion of third-party beneficiaries from the "stranger doctrine" has been expanded to cover those who benefit from the contract of others, without regard to whether the beneficiary was intended by the contracting parties to be a third-party beneficiary. See *Lake Tightsqueeze v. Chrysler First Fin. Svcs. Corp.*, supra, 210 Ga. App. 178 (5) (one who would benefit from the contract with which one is alleged to have interfered is not a stranger to the contract and cannot have tortiously interfered), and *Disaster Svcs. v. ERC Partnership*, 228 Ga. App. 739 (492 SE2d 526) (1997) (one with a direct economic interest in the contract, even though not a third-party beneficiary, is not a stranger to the contract).

In *Jefferson-Pilot Communications Co. v. Phoenix City Broadcasting*, 205 Ga. App. 57, 60 (421 SE2d 295) (1992), the shadow of liability for tortious interference was further diminished when the Court of Appeals reasoned that "all parties to a comprehensive interwoven set of contracts which provided for the financing, construction, and transfer of ownership" were not strangers, i.e., the purchaser of a radio station was not a stranger to the contractual relations between the radio station's seller and the seller's lenders. Thus, in order for a defendant to be liable for tortious interference with contractual relations, the defendant must be a stranger to both the contract *and* the business relationship giving rise to and underpinning the contract. *Renden, Inc. v. Liberty Real Estate*, 213 Ga. App. 333 (444 SE2d 814) (1994) (where the lessor was "an essential entity" to the subletting of space by its tenant since the tenant's right to sublease was set forth in the lessor's lease).[2] But see *Strahley v. Pruitt Corp.*, 231 Ga. App. 502 (1) (498 SE2d 78) (1998), where the Court of Appeals held that

---

[2] While the tort alleged in *Renden, Inc. v. Liberty Real Estate* was tortious interference with a *business* relationship, the applicability of the "stranger doctrine" is the same for that tort as for tortious interference with a contractual relationship.

the corporate owner and operator of nursing homes, while "inextricably bound together" with the residents and an independent health care provider serving the residents, could be liable, in light of the statutory Bill of Rights for Residents of Long-Term Care Facilities (OCGA § 31-8-101 et seq.), for tortious interference with contractual relationships between the residents and the health care provider; *Cumberland Center Assoc. v. Southeast Management &c. Corp.*, 228 Ga. App. 571 (3) (b) (492 SE2d 546) (1997), where the Court of Appeals, without mentioning the "stranger doctrine," held that the tenant who had been procured by a leasing agent to rent office space could be held liable for tortious interference with a commission agreement between the leasing agent and the landlord; and *Sunamerica Financial v. 260 Peachtree St.*, 202 Ga. App. 790 (3) (b) (415 SE2d 677) (1992), where the Court of Appeals declined to hold as a matter of law that a parent corporation is not a stranger to the contracts of the corporation's wholly-owned subsidiary or of the latter's wholly-owned subsidiaries.

We endorse the Court of Appeals' line of cases which, in effect, reduce the number of entities against which a claim of tortious interference with contract may be maintained. We reiterate that, in order to be liable for tortious interference, one must be a stranger to both the contract at issue and the business relationship giving rise to and underpinning the contract. *Renden, Inc. v. Liberty Real Estate*, supra, 213 Ga. App. 333. In other words, all parties to an interwoven contractual arrangement are not liable for tortious interference with any of the contracts or business relationships. *Jefferson-Pilot Communications v. Phoenix Broadcasting*, supra, 205 Ga. App. at 60. Any statements or holdings to the contrary in *Strahley v. Pruitt Corp.*, supra, 231 Ga. App. 502; *Cumberland Center Assoc. v. Southeast Management*, supra, 228 Ga. App. 571; and *Sunamerica Financial v. 260 Peachtree St.*, supra, 202 Ga. App. 790, are hereby disapproved. Accordingly, we reverse the Court of Appeals' rejection of Equitable's assertion that it was not a stranger to McLane's employment contract with AMC and hold that the trial court was correct in granting Equitable summary judgment on McLane's claim of tortious interference with contract.

*Judgment reversed in part in Case No. S97G1229. Judgment reversed in Case No. S97G1239. All the Justices concur.*

DECIDED JULY 13, 1998 —
RECONSIDERATION DENIED JULY 30, 1998.

*Schnader, Harrison, Segal & Lewis, C. Wilson Dubose, Mary Anne Hall, Dionna K. Rutkowski,* for Atlanta Market Center Man-

agement Company.

*Alston & Bird, Douglas A. S. Chalmers, Jr., G. Conley Ingram, William H. Hughes, Jr.,* for Equitable Real Estate Investment Management, Inc.

*James L. Ford, Sr., Terry D. Jackson,* for McLane.

*Schulten, Ward & Turner, Lou Litchfield, Littler Mendelson, J. Roy Weathersby, Huprich & Associates, Don C. Huprich, Philip S. Andrews,* amici curiae.