[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-15423

_____

D. C. Docket No. 1:07-cv-00172-ODE

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 5, 2012
JOHN LEY
CLERK

GT SOFTWARE, INC.,

Plaintiff - Appellee,

versus

WEBMETHODS, INC.,

Defendant - Appellant.

_____

No. 10-15628

_____

D. C. Docket No. 1:07-cv-00172-ODE

GT SOFTWARE, INC.,

Plaintiff - Appellant,

versus

WEBMETHODS, INC.,

Defendant - Appellee.

_____

Appeals from the United States District Court
for the Northern District of Georgia
_____

(March 5, 2012)

Before EDMONDSON and ANDERSON, Circuit Judges, and LAWSON,* District Judge.

PER CURIAM:

GT Software, Inc. ("GT"), brought a tortious interference claim against webMethods, Inc. ("WM"), after WM instructed Action Motivation, Inc. ("AMI"), to withhold sales leads gathered by GT at Integration World, a convention hosted by WM in November 2006. WM had hired TBA Global, LLC ("TBA"), to run the convention, and TBA hired AMI to provide scanners that could store the name and business information of convention attendees who approached any booth and expressed an interest in the products being sold. GT contracted with AMI to provide this sales-lead service.

However, WM removed GT's representatives from the convention after GT issued a news release that WM believed contained inaccuracies about WM's partner company DataDirect, whose products compete with GT's. WM instructed

_____

*Honorable Hugh Lawson, U. S. District Judge for the Middle District of Georgia, sitting by designation

2

TBA to ensure that GT did not receive any of the sales leads that GT had collected using AMI's scanners.

Almost two months after the convention ended, GT finally received its sales leads, but GT believed that the information had become almost worthless because a two-month delay showed potential customers that GT was "unresponsive, uninterested, lazy or worse" and also because there had been only a narrow window of time during which customers would be especially interested in switching to GT's products. GT believed that it had lost at least one sale–to Fisher Scientific–because of the delay in receiving the leads.

In the first trial at district court, the jury awarded GT $250,325 in compensatory damages (including lost profits), $421,261 in attorneys' fees, and $2,140,000 in punitive damages for WM's tortious interference of the contract between AMI and GT.[1] The district court then granted WM's motion for reduction of the compensatory damages, reducing them to just $325 because no reasonable jury could have found that GT had lost $250,000 in profits. The district court also reduced the punitive damages to $14,300 and granted a conditional remittitur of $3,250 on attorneys' fees. GT opted to have a second trial solely on the issue of

_____

[1] The jury also awarded $10,600 to GT for damages resulting from WM's breach of its own contract with GT for renting a booth at Integration World. However, neither party appeals this award.

attorneys' fees.  At the second trial, the jury awarded $517,168.34 to GT for attorneys' fees.  This time, the district court denied WM's motions for judgment as a matter of law or remittitur on the attorneys' fees.

Both WM and GT appeal.  On appeal, WM is the appellant with respect to two issues–i.e. the existence <u>vel non</u> of a tortious interference claim, and the attorneys' fees award.  GT is the appellant with respect to two issues–i.e. the compensatory damages award, and the punitive damages award.

## I. <u>Tortious Interference and Attorneys' Fees</u>

An essential element of a tortious interference claim in Georgia is that the defendant must be a "'third party,' i.e., a 'stranger' to the contract with which the defendant allegedly interfered."  <u>Atlanta Market Ctr. Mgmt. Co. v. McLane</u>, 503 S.E.2d 278, 282 (Ga. 1998).  Under this requirement, Georgia courts have said that there can be no tortious interference claim where the plaintiff and defendant were parties to "a comprehensive interwoven set of contracts."  <u>Jefferson-Pilot Commc'ns Co. v. Phoenix City Broad., Ltd. of Atlanta</u>, 421 S.E.2d 295, 299 (Ga. Ct. App. 1992).  In other words, "the defendant must be a stranger to both the contract <u>and</u> the business relationship giving rise to and underpinning the contract."  <u>Atlanta Market Ctr.</u>, 503 S.E.2d at 283 (emphasis in original); <u>see also</u> <u>Iraola & CIA, S.A. v. Kimberly-Clark Corp.</u>, 325 F.3d 1274, 1283-84 (11th Cir. 2003).

In this case, the contract that WM allegedly interfered with was part of a set of interwoven contracts all relating to Integration World. WM contracted with TBA to run the convention; TBA contracted with AMI to provide scanners at the convention; AMI contracted with GT to provide a scanner; and GT contracted with WM to rent a booth at the convention. Given these interwoven contracts and facts, WM was not a stranger to the business relationship giving rise to and underpinning the contract between GT and AMI. Atlanta Market Ctr., 503 S.E.2d at 283. Under Georgia law, there could be no tortious interference claim. See id.; Iraola, 325 F.3d at 1284.

However, WM never presented this argument to the district court during either trial, instead raising it for the first time on appeal.[2] Accordingly, WM has waived its argument that it was not a stranger to the contract with which it allegedly interfered, and we cannot consider it for those issues with respect to which WM is the appellant. Access Now, Inc. v. Sw. Airlines Co., 385 F.3d 1324, 1331 (11th Cir. 2004) (noting that we have "repeatedly held that an issue not raised in the district court and raised for the first time in an appeal will not be considered") (quotation omitted). Thus, WM cannot rely upon the "stranger" theory as support for its challenge to the existence of a tortious interference claim.

---

[2] WM did argue to the district court that WM could not have intended to interfere with the contract because it had no knowledge of it. However, as indicated by Georgia courts, the intent to injure the plaintiff is a separate element from being a stranger to the contract. See Disaster Servs., Inc. v. ERC P'Ship, 492 S.E.2d 526, 528 (Ga. Ct. App. 1997).

WM's only other alleged error from the first trial with respect to the existence of a tortious interference claim is that no reasonable jury could have found that WM had intended to interfere with the contract between GT and AMI.[3] Atlanta Market Ctr., 503 S.E.2d at 282. WM properly preserved this argument, but we discern no error in the district court's conclusion. A reasonable jury could find that WM knew that a separate contract existed for the retrieval of sales leads, because WM knew that the sales leads were not provided by WM itself, and probably knew that TBI was not itself providing the sales leads. This meant that a third party must have been providing the service to GT, and there was sufficient evidence of interference by WM.

We also find no error in the award of attorneys' fees in the second trial. The Supreme Court of Georgia has stated that there is no proportionality requirement between attorneys' fees and compensatory damages where a showing of bad faith has been made under O.C.G.A. § 13-6-11. Tyler v. Lincoln, 527 S.E.2d 180, 183 (Ga. 2000) (holding that § 13-6-11 "authorizes an attorney fee award even when nominal damages are recovered"); Spring Lake Prop. Owners Ass'n, Inc. v. Peacock, 390 S.E.2d 31, 31-32 (Ga. 1990) (allowing an attorneys' fees award of $7500 under § 13-6-11 when only $1 in damages had been awarded); see also

---

[3] We review de novo a motion for judgment as a matter of law under Rule 50. Combs v. Plantation Patterns, 106 F.3d 1519, 1526 (11th Cir. 1997) (noting that judgment as a matter of law is appropriate only if "the facts and inferences point overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary verdict").

6

LaRoche Indus., Inc. v. AIG Risk Mgmt., Inc., 959 F.2d 189, 193 (11th Cir. 1992) ("[W]e are governed by the law in Georgia which places the question of attorneys' fees within the province of the jury and provides that the court should not vacate such an award unless there was absolutely no evidence to support it."). Accordingly, we find no merit in WM's argument that it was error for the district court to allow an award of $517,168.34 in attorneys' fees with just $325 in compensatory damages.[4]

## II. Compensatory and Punitive Damages

GT argues that the first jury's awards of $250,000 in lost profits and $2,140,000 in punitive damages should be reinstated. Since GT is appellant for these issues, we can affirm the reduced awards favoring WM, so long as they are supported by any ground in the record. Bircoll v. Miami-Dade Cnty., 480 F.3d 1072, 1088 n.21 (11th Cir. 2007).

We affirm the reduced punitive damages of $14,300 and compensatory damages of $325 on the ground that, as discussed above, WM was not a stranger to the contract with which it interfered, and thus there is no evidence in the record of a viable tortious interference claim. Atlanta Market Ctr., 503 S.E.2d at 283-84;

---

[4] We find no reversible error in WM's remaining assertions of error in the second trial on attorneys' fees.

Iraola, 325 F.3d at 1283-84.[5]

### III. Conclusion

In summary, we affirm, rejecting the challenges on appeal by appellant WM and rejecting the challenges on appeal by cross-appellant GT. In other words, we affirm the district court's rulings in favor of GT in the amount of $10,600 (damages from WM's breach of the rental booth contract with GT), plus $325 (compensatory damages from tortious interference), plus $14,300 (punitive damages for tortious interference), plus $517,168.34 (attorneys' fees).

AFFIRMED.

---

[5] We find no merit in GT's argument that the district court erred by considering WM's motion to reduce or remit the first jury's awards.