[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 914 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 915 
Rogers Willard, Inc. ("R W"), appeals from an order of the Baldwin Circuit Court denying its motion for an award of attorney fees. Dr. Brent Harwood cross-appeals from an order granting R Ws motion for an award of costs and from orders denying Harwood's postjudgment motion for a judgment as a matter of law ("JML") or, in the alternative, for a new trial. We reverse as to the appeal and affirm as to the cross-appeal.
On August 29, 2002, R W, a general contractor specializing in commercial construction, entered into a contract to construct a new office building for Harwood's podiatry practice. Harwood moved into the building in May 2003, but he refused to remit the final payment of $63,992.97 to R W, claiming that there were deficiencies in the construction.
R W sued Harwood, alleging claims of breach of contract and failure to make timely payments to a contractor under § 8-29-1 et seq., Ala. Code 1975, and seeking to enforce a lien against Harwood's property pursuant to § 35-11-210, Ala. Code 1975.[1] R W also asserted a claim against Robert J. Kaiser III, alleging that Kaiser had intentionally interfered with a business relationship between R W and Harwood.
Harwood answered and counterclaimed, asserting breach-of-contract, negligence, fraud, slander-of-title, conversion, and breach-of-fiduciary-duty claims against R 
W. Harwood also asserted a claim against Steven Willard, alleging that Willard had intentionally interfered with a business relationship between Harwood and AmSouth Bank. *Page 916 
The trial court entered a summary judgment in favor of Kaiser on R W's intentional-interference claim against him. It also entered a summary judgment in favor of Willard on Harwood's intentional-interference claim against him. At trial, the parties stipulated that the issues of attorney fees and costs claimed by R W pursuant to § 8-29-6, Ala. Code 1975, were "reserved for adjudication by [the trial court] as to the amount deemed reasonable in the event of a verdict in favor of [R W]."
The evidence at the five-day trial of this case established that the parties had spent several months negotiating the terms of a written construction contract. Those negotiations culminated in the signing of AIA Document All 1-1997, Standard Form of Agreement Between Owner and Contractor — a costplus agreement with a guaranteed maximum price of $789,379, whereby Harwood was to pay the costs of the project plus a 10% fee for R W, with any costs savings to be divided equally between the parties. The contract incorporated, among other things, the drawings and specifications of Bay Area Architects, Inc.
R W agreed to achieve "substantial completion" of the project within 200 calendar days of the commencement date or, failing that, to pay liquidated damages in the amount of $500 per day for every day the project was not "substantially complete." The contract provided that Harwood would make periodic progress payments to R W, with the final payment of the entire unpaid balance of the contract price to be made when
 "1. [R W] has fully performed the contract except for the contractors's responsibility to correct work . . . and to satisfy other requirements, if any, which extend beyond final payment; and
 "2. A final certificate for payment has been issued by the architect."
During the site-preparation phase of the construction project, it became apparent that the construction site was extremely flat and that it would be necessary to bring in fill dirt to elevate the slab. An unusually rainy period combined with changes to the site elevation resulted in flooding to the property of adjoining landowners. The civil engineers hired by the architect twice attempted to redesign a system of stormwater drainage that would rectify the flooding problem; R W installed the redesigned systems at no additional charge. Nevertheless, the drainage problem had still not been corrected at the time of trial. The evidence was in conflict with respect to whether the civil engineers' remedies were inadequate as redesigned, whether R W had failed to properly execute the engineers' redesigns, and whether Harwood was ultimately responsible for obtaining a drainage easement from an adjoining property owner. When the City of Fairhope issued Harwood a certificate of occupancy and Harwood moved into the building on May 23, 2003, the certificate of occupancy was limited to the "building only," with a notation that the Baldwin County Planning and Zoning Department had not granted "landscape and zoning approval." After Harwood moved into the building, R W refused to do any "further work related to [the drainage problem because it had] not been paid for the work previously done."
Forrest Daniell, one of the project architects, testified that the 200-day period specified in the contract for completion of the construction project could legitimately be extended for various reasons, including the 20 inches of rain that had fallen early in the construction process. Daniell stated that R W had undertaken and completed the construction project in a timely manner, had not delayed the process, and had not asked for an extension based on rainfall or any other occurrence. Mike *Page 917 
Rogers, the president of R W, testified that several times during the construction process he had requested that Harwood pick out the material finishes, such as paint and stain colors, so that he could obtain the necessary materials. When he did not receive a response to his repeated requests from Harwood, Rogers wrote to Mark Hammond, one of the project architects, stating that he had "requested numerous times that the finishes be selected for the project" and alerting Hammond to the fact that R W could be "delayed in completing the job on time because of lack of information." Rogers listed "trim colors" and "door and cabinet stain color" as two items for which he needed information about Harwood's choices.
After Harwood moved into the building, he and Daniell created a punch list of items to be corrected by R W. R W began working to complete the items on the punch list and submitted its request for final payment. Daniell testified that R W had substantially completed the work called for in the contract as of May 23, 2003, the date that Harwood moved into the building. He explained:
 "Typically, the contractor reaches substantial completion about the same time he gets a certificate of occupancy for the building. You know, the city comes in and does an inspection to make sure that all of the health and safety issues have been taken care of in the building. It does not mean the building is 100 percent finished. It just means that everything the building is intended to be used for can be used. But it doesn't mean that there aren't punch-list items to be taken care of, such as paint blemishes, things that need to be repaired and that kind of thing."
Daniell testified that he had signed the certificate of final payment at the end of May 2003, when Harwood owed R W $83,992.97. He further explained:.
 "Normally, on the final application for payment, the procedure is we go through the punch-list items [to determine the] items that are remaining that need to be done. And we have an estimated value of the cost to do that portion of the work.
 "And so you go through these punch-list items, and you say[, for example,] that these 10 or 15 items are going to cost $10,000 to do. Then you multiply that by some safety factor, 1.5, maybe 2. Let's say we held back . . . two times as much as we thought it would cost to do these repairs. So you hold back 20 [thousand dollars], for example. When everything has been completed in a satisfactory manner, you pay that money. And at that point when the contractor has completed the punch list items and those things that we held back the money for, then you pay that final payment.
 "When I signed that final application, I was expecting to go through that process. But things never got resolved between Dr. Harwood and Mike Rogers and we never got to that point."
Daniell stated that he had never issued the certificate of final payment; instead the certificate had remained in Daniell's outbox pending the resolution of conflicts between Harwood and R W. Daniell testified that the certificate had been lost when he moved to a new office.
In mid July 2003, Harwood hired a consultant, Robert J. Kaiser III, to advise him about bringing the construction project to a successful completion. Kaiser had done general contracting work in the past, but he was not a licensed general contractor at the time he worked for Harwood. Because Harwood was busy with his podiatry practice, he instructed Rogers to communicate with Kaiser about construction issues. Kaiser began to create a second punch list, which contained a number of items that *Page 918 
had not appeared on the first punch list. One of the items on the second punch list was the "flaking off' of the color and pattern in the stamped concrete sidewalk leading to the building entrance. Another item was Harwood's dissatisfaction with the color of the stain on the wooden cabinets in the podiatry clinic and the fact that, Harwood said, the finish on the cabinets was inconsistent throughout the office and did not match his furniture. Harwood also expressed dissatisfaction with the color and woodgrain pattern of the trim installed in the building. Rogers testified that the architect had specified poplar wood for the interior trim. Rogers explained that, because the grain and coloration of poplar is extremely varied, it is normally finished with a dark or opaque stain. Harwood, however, chose a light, pickled finish for the trim that made the grain variations in the wood more noticeable. Both Rogers and Daniell testified that, if Harwood had chosen a darker finish, the trim would have matched or, if Harwood had chosen the material finishes earlier in the process and Rogers had known then that Harwood preferred a lighter finish, Rogers would have replaced the poplar trim with birch to match the doors and cabinets. Daniell gave his opinion that the problem with the trim could have been avoided if Harwood had chosen the stain color earlier.
In late August 2008, Kaiser convinced Harwood to make a $20,000 payment to Rogers so that R W could pay its subcontractors. On September 10, 2003, Rogers met with Kaiser, who had been adding items to the second punch list for a month, to finalize the punch list so that R W could schedule its subcontractors and complete the repairs. Among other things, Rogers agreed to try to fix the color-match problems with the cabinets and trim. During a two-month period after September 10, 2003 — a time that was marked by numerous disagreements between Rogers and Kaiser — R W performed punch-list repairs and was paid nothing further.
On November 11, 2003, R W discontinued the work on the punch list; Harwood and Kaiser met with a lawyer to discuss the matter. During a telephone conversation with Kaiser on December 1, 2003, Rogers asked for a draw and Kaiser informed him that there would be no more draws until R W completed the punch list. When Rogers stated that R W would file a lien against Harwood's property, Kaiser said, "Go screw yourself and file your f___ing lien," at which point Rogers ended the conversation and wrote a letter to Harwood, stating in part:
 "I have tried to be reasonable throughout this process and will continue to do so, but we are being forced to secure our position by filing a lien on the job. We will also instruct our subcontractors who are owed money to do the same.
 "If you would like to settle this issue without resorting to liens, lawyers, and a great deal of wasted time, I will be glad to talk to you at any time. I do not intend to have further discussions with your consultant, based on his unprofessional behavior."
R W sued Harwood less than a month later, on December 30, 2003.
At the close of all the evidence, the trial court entered a JML in favor of R W on Harwood's fraud, conversion, and breach-of-fiduciary-duty claims. The trial court charged the jury on R Ws breach-of-contract claim and on Harwood's breach-of-contract and negligence counterclaims. It submitted two special interrogatories to the jury: whether Harwood was entitled to damages pursuant to the liquidated-damages provision of the parties' contract and whether R W had slandered Harwood's title by filing a lien against Harwood's property. The jury was not charged on *Page 919 
any aspect of § 8-29-1 et seq., the act relating to timely payments to contractors.
The jury returned a verdict in favor of R W on its breach-of-contract claim against Harwood and awarded R W damages in the amount of $38,315.97; it also returned a verdict in favor of R W on Harwood's counterclaims. In answer to the two special interrogatories, the jury determined that Harwood was not entitled to liquidated damages and that R 
W had not slandered Harwood's title to the subject property by filing a lien against the property.
On March 23, 2006, the trial court entered a judgment on the jury verdict. On April 17, 2006, Harwood filed a post-judgment motion. On April 19, 2006, R W filed a motion to tax costs and to award it attorney fees pursuant to § 8-29-6. The parties expressly consented on two occasions to extend the pendency of their motions beyond the 90-day period provided in Rule 59.1, Ala. R.App. P. See State v. Redtop Market,Inc., 937 So.2d 1013 (Ala. 2006).
On September 28, 2006, the trial court denied Harwood's postjudgment motion, taxed costs in the amount of $8,893.85 against Harwood, and denied, without stating a reason, R 
Ws motion to award it an attorney fee. On October 19, 2006, R W filed a motion to reconsider the denial of its request for an attorney fee. On November 2, 2006, the trial court entered an order stating its reasons for denying R Ws attorney-fee request.
R W appeals, raising one issue — that the trial court erred by failing to award it an attorney fee pursuant to § 8-29-6. Harwood cross-appeals, raising five issues: (1) that the trial court erred by denying his motion for a JML on R Ws breach-of-contract claim; (2) that the jury verdict in favor of R W on Harwood's breach-of-contract counterclaim was against the great weight of the evidence; (3) that the jury's response to the special interrogatory regarding liquidated damages was unsupported by the evidence; (4) that the trial court erred by taxing costs of $8,893.85 to him; and (5) that the trial court erred by entering a summary judgment in favor of Steven Willard on Harwood's claim against Willard.
The Issue Presented on R W's Appeal
Sections 8-29-1 through 8-29-8, Ala. Code 1975, compose a chapter of the Alabama Code entitled "Timely Payments to Contractors and Subcontractors," and are sometimes referred to as "the Deborah K. Miller Act," see Tolar Constr., LLC v.Kean Elec. Co., 944 So.2d 138, 142 (Ala. 2006), or "the Prompt Pay Act," see R.P. Indus., Inc. v. S M Equip.Co., 896 So.2d 460, 461 (Ala. 2004).
 "The Miller Act was enacted in 1995 and serves as Alabama's equivalent of the `prompt-payment acts' enacted in many other states. See John W. Hays, Prompt Payment Acts: Recent Developments and Trends, 22 Constr. Law. 29 (2002). The Miller Act affords contractors, subcontractors, and sub-subcontractors special remedies against owners, contractors, and subcontractors, respectively, when the latter improperly withhold payment."
Tolar Constr. LLC v. Kean Elec. Co., 944 So.2d at 147.
Section 8-29-2 provides that "[p]erformance by a contractor, subcontractor, or sub-subcontractor in accordance with the provisions of his or her contract entitles them to payment from the party with whom they contract. All contracts between parties require a date of payment." Section 8-29-3(d) provides:
 "If the owner, contractor, or subcontractor does not make payment in compliance with this chapter, the owner, contractor, or subcontractor shall be obligated to pay his or her contractor, *Page 920 
subcontractor, or sub-subcontractor interest at the rate of one percent per month (12% per annum) on the unpaid balance due."
Section 8-29-4 provides, in part:
 "(a) Nothing in this chapter shall prevent the owner, contractor, or subcontractor from withholding application and certification for payment for any of the following reasons if there is a bona fide dispute over one or more of the following:
 "(1) Unsatisfactory job progress.
 "(2) Defective construction not remedied.
 "(3) Disputed work.
 "(4) Third party claims filed or reasonable evidence that a claim will be filed.
 "(5) Failure of the contractor, subcontractor, or sub-subcontractor to make timely payments for labor, equipment, and materials.
 "(6) Property damage to owner, contractor, or subcontractor.
 "(7) Reasonable evidence that the contract, subcontract, or sub-subcontract cannot be completed for the unpaid balance of the contract or contract sum.
 "(b) In the event that there is a bona fide dispute over all or any portion of the amount due on a progress payment from the owner, contractor, or subcontractor then the owner, contractor, or subcontractor may withhold payment in an amount not to exceed 2 times the disputed amount."
Section 8-29-6 provides:
 "A contractor, subcontractor, or sub-subcontractor may file a civil action solely against the party contractually obligated for the payment of the amount claimed to recover the amount due plus the interest accrued in accordance with this chapter. If the court finds in the civil action that the owner, contractor, or subcontractor has not made payment in compliance with this chapter, the court shall award the interest specified in this chapter in addition to the amount due. In any such civil action, the party in whose favor a judgement is rendered shall be entitled to recover payment of reasonable attorneys' fees, court costs and reasonable expenses from the other party."
R W did not seek a statutory interest penalty pursuant to § 8-29-3(d).
The trial court's November 2, 2006, order setting out its reasons for denying R W's attorney-fee request states:
 "The Court, having considered [R Ws] motion to reconsider an award of attorneys' fees and having reviewed the case of Tolar Construction, LLC v. Kean Electric Company, [944 So.2d 138
(Ala. 2006)], hereby finds as follows:
 "That in its initial ruling on attorneys' fees, the Court considered the plain meaning of the Miller Act and determined that each party had acted in a reasonable manner to protect its interest in a construction dispute. In addition, the Court determined that the owner had presented evidence of construction defects and omissions, some of which had not been corrected as of the date of trial, e.g., drainage problem and the owner not having received a certificate of occupancy, among others. Also, it appears from the verdict that the jury found in favor of both parties as to some of the claims presented.
 "Accordingly, the Court finds that no attorneys' fees should be awarded in this case and each party should pay their own attorneys' fees."
R W argues that the trial court misinterpreted and misapplied Tolar Construction, LLC v. Kean ElectricCompany. In that case, a subcontractor sued a contractor, alleging breach of contract and seeking interest, costs, and attorney fees under *Page 921 
the Miller Act. The contractor filed a counterclaim alleging breach of contract. The case was tried to a jury, and the parties agreed that the trial court would decide the Miller Act claims for interest, costs, and attorney fees. The trial court did not instruct the jury as to the substantive provisions of the Miller Act; that is, it did not explain the "`bona fide dispute' principle of § 8-29-4 or the `payment in compliance' concept of § 8-29-3(d); rather it reserved to itself the determination of those statutorily indispensable preconditions to an award of prejudgment interest." TolarConstruction, 944 So.2d at 151. The jury returned a verdict in favor of the subcontractor on its breach-of-contract claim and on the contractor's breach-of-contract counterclaim and awarded the subcontractor compensatory damages in the amount of $88,652.27. The trial court entered a judgment on the verdict and set a hearing for "`the determination of attorney's fees, litigation costs, and interest, to be assessed against [the contractor]."' 944 So.2d at 143.
Following the hearing, the trial court determined:
 "`Since the Miller Act authorizes payment to be withheld when there is a bona fide dispute concerning job progress, defects in construction, and other statutorily specified reasons, interest does not accrue during such periods of dispute.
 "`This court is satisfied that the amounts withheld by [the contractor] were withheld because of a bona fide dispute within the meaning of the Miller Act.'"
944 So.2d at 144. Accordingly, the trial court held that the subcontractor was not entitled to the statutory interest penalty set out in § 8-29-3(d). The court, however, awarded the subcontractor an attorney fee and costs in the amount of $36,518.35 pursuant to the third sentence of § 8-29-6
because the subcontractor was the "party in whose favor a judgment [was] rendered."
The contractor appealed, arguing that unless the prevailing party was entitled to the interest penalty specified in the Miller Act — a penalty award to which, the trial court had found, the subcontractor was not entitled — then the prevailing party was not entitled to the attorney fees, court costs, and expenses specified in the Miller Act. The Alabama Supreme Court rejected that argument and affirmed the attorney-fee award. The court explained:
 "[The contractor] links the propriety of an award of prejudgment interest and the propriety of an award of attorney fees by `collapsing' the text of Ala. Code 1975, § 8-29-6. [The contractor] states in its principal brief that
 "`[t]he statute also provides that "if the court finds . . . that the . . . contractor . . . has not made payment in compliance with this chapter, the party in whose favor a judgment is rendered shall be entitled to recover payment of reasonable attorneys' fees, court costs and reasonable expenses from the other party." Ala. Code § 8-29-6 (1995).'
 "([The contractor's] brief, at 18.) As seen from a reading of the complete text of the portion of § 8-29-6 quoted only partially by [the contractor], what [the contractor] merges into one sentence constitutes two separate sentences, the first of which mandates awarding 12% interest if the court finds `that the . . . contractor . . . has not made payment in compliance with [the Act],' and the second of which provides that `the party in whose favor a judgement is rendered shall be entitled to recover payment of reasonable attorneys' fees, court costs and reasonable expenses from the other party.' Thus, under a plain reading of *Page 922 
§ 8-29-6, only [the contractor], if found not to have made payment in compliance with the act, could have been penalized by an award of interest made to the [subcontractor], whereas either party, so long as it was `the party in whose favor a judgement [was] rendered,' would be entitled to recover attorneys' fees, court costs, and reasonable expenses `from the other party.'"
944 So.2d at 147-48.
In response to R W's argument that the trial court erred by failing to award it an attorney fee, Harwood makes essentially the same argument that the losing contractor made in Tolar Construction, namely: that a party does not violate the Miller Act — and therefore, that the statutory interest, costs, and attorney-fee penalties do not come into play — unless that party "has not made payment in compliance with [the Act]," § 8-29-6, and its withholding of payment was not pursuant to "a bona fide dispute," § 8-29-(b). We conclude that in TolarConstruction our supreme court made it unmistakably clear that the Miller Act "provides for awarding attorney fees irrespective of whether a party is entitled to interest under [the Act]," 944 So.2d at 150, and that "the allowance for attorney fees found in the Miller Act is not tethered to provisions conditioning an award upon a showing of some sort of bad faith," id.
Pursuant to our supreme court's interpretation of § 8-29-6
in Tolar Construction, we must hold that the trial court erred by failing to award R W a reasonable attorney fee.
 Issues Presented on Harwood's Cross-Appeal 1. R W's Breach-of-Contract Claim
Harwood argues that the trial court erred in denying his motion for a JML on R W's breach-of-contract claim because, he says, the existence of two conditions necessary to trigger his obligation to make the final payment — that R W had "fully performed" and that the architect had issued a final certificate for payment — never occurred.
In Waddell Reed, Inc. v. United Investors LifeInsurance Co., 875 So.2d 1143, 1152 (Ala. 2003), our supreme court explained the standard of review applied to a ruling on a motion for a JML:
 "When reviewing a ruling on a motion for a JML, this Court uses the same standard the trial court used initially in deciding whether to grant or deny the motion for a JML. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala. 1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1350 (Ala. 1992). The nonmovant must have presented substantial evidence in order to withstand a motion for a JML. See § 12-21-12, Ala. Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Id."
Initially, we note that the trial court instructed the jury on the concept of "substantial performance," and Harwood failed to object to those instructions. He has, therefore, waived the argument that "full performance" was required by the parties' contract. See Tolar Construction, *Page 923 944 So.2d at 146 (stating that "[b]ecause [the contractor] failed to object to the trial court's jury instructions, those instructions are the law of the case, and [the contractor] cannot now complain about the jury's obedience to them").
Moreover, our supreme court has held that a building contractor may recover despite the fact that he is not in full performance of the contract. See Miles v. Moore, 262 Ala. 441,79 So.2d 432 (1955):
 "`The question is therefore presented as to whether or not there must be a literal performance of the building contract or whether a substantial performance of such a contract will support a recovery on the contract where in effect the owner has accepted the building. The question of substantial performance should be determined in each case with reference to the existing facts and circumstances of the case. Substantial performance does not contemplate a full or exact performance in every slight or unimportant detail but performance of all important parts.'"
262 Ala. at 445, 79 So.2d at 435 (quoting Wilson v.Williams, 257 Ala. 445, 447, 59 So.2d 616, 617 (1952)).See also Huffman-East Dev. Corp. v. Summers Elec. SupplyCo. 288 Ala. 579, 582-83, 263 So.2d 677, 680 (1972) (stating that "[i]f the work done substantially conforms to the contract, immaterial deviations will not prevent recovery of the contract price, less the amount required to indemnify for injuries sustained by such deviations"). We hold that R W presented substantial evidence indicating that it had substantially performed the contract; the issue was, therefore, properly submitted to the jury for its resolution.
Harwood cites no authority, as Rule 28(a)(10), Ala. R.App. P., requires, for his contention that the issuance of an architect's certificate of final payment "is determinative as a matter of law" with respect to R Ws right to recover.
 "`[I]t is well settled that a failure to comply with the requirements of Rule 28(a)(10) [, Ala. R.App. P.,] requiring citation of authority in support of the arguments presented provides this Court with a basis for disregarding those arguments.' State Farm Mut. Auto. Ins. Co. v. Motley, 909 So.2d 806, 822
(Ala. 2005). We may do so because ` "it is not the function of this Court to do a party's legal research or to make and address legal arguments for a party based on undelineated general propositions not supported by sufficient authority or argument."' Butler v. Town of Argo, 871 So.2d 1, 20
(Ala. 2003) (quoting Dykes v. Lane Trucking, Inc., 652 So.2d 248, 251 (Ala. 1994))."
State Farm Mut. Auto. Ins. Co. v. Bennett,974 So.2d 959, 962 (Ala. 2007).
 2. Harwood's Breach-of-Contract Counterclaim
In the Statement of the Issues section of his brief, Harwood lists, as his second issue on the cross-appeal, "whether the verdict in favor of R W on Harwood's counterclaim was contrary to the great weight of evidence adduced at trial." He makes no argument with respect to that issue, however, and he has thereby failed to satisfy the minimum requirements of Rule 28(a)(10), Ala. R.App. P., which provides that an appellant's brief shall contain "[a]n argument containing the contentions of the appellant/petitioner with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on." This court will not consider on appeal issues that are not properly presented and argued in brief. "When an appellant fails to properly argue an issue, that issue is waived and will not be considered. Boshell v. Keith, *Page 924 
418 So.2d 89 (Ala. 1982)." Asam v. Devereaux, 686 So.2d 1222,1224 (Ala.Civ.App. 1996). "An appellate court will consider only those issues properly delineated as such and will not search out errors which have not been properly preserved or assigned."Ex parte Riley, 464 So.2d 92, 94 (Ala. 1985).
 3. Liquidated Damages
The parties' contract provided, in pertinent part:
 "[R W] shall achieve substantial completion of the entire work not later than two hundred (200) calendar days from the date of commencement. [R 
W] shall be assessed liquidated damages in the amount of $500/day for every day the project is not substantially complete."
The parties agree that, for purposes of the liquidated-damages provision, the date of substantial completion was May 23, 2003, the date that Harwood moved into the office building. However, because the contract did not fix the "date of commencement," much of the evidence at trial was directed to that issue, with R W taking the position that the commencement date was the date it obtained the building permit from the City of Fairhope — which, it says, was no earlier than October 29, 2002, and may have been as late as November 11, 2002 — and Harwood taking the position that the commencement date was either August 29, 2002, when the contract was signed, or some time later when R W actually began the site-preparation work.
On his cross-appeal, Harwood argues that, even accepting a commencement date of October 29, 2002, 207 days elapsed between that date and May 23, 2003, and, he says, the 7-day delay past the 200-day limit established in the contract entitled him to at least $3,500 in liquidated damages as a matter of law.[2]
Accordingly, he argues that the jury's answer to the special interrogatory indicating that he was entitled to no liquidated damages should be set aside as being against the great weight of the evidence and that a judgment of no less than $3,500 should be rendered in his favor.
Harwood's argument ignores the fact that the jury had before it the testimony of Mike Rogers, who stated that, according to his daily reports, R W obtained the building permit on November 11, 2002. The time period between November 11, 2002 and May 23, 2003 is 193 days. In addition, the jury heard evidence from Forrest Daniell indicating that R W had undertaken and completed the construction project in a timely manner, had not delayed the process, and had not asked for an extension of time based on excessive rainfall or any other occurrence. Moreover, the jury heard the testimony of Mike Rogers indicating that Harwood was guilty of a delay in choosing the material finishes that precipitated a disagreement about the color and woodgrain pattern of the trim installed in the building.
"A jury verdict is presumed correct, and this presumption is strengthened by the trial court's denial of a motion for new trial." Med Plus Props, v. Colcock Constr. Group,Inc., 628 So.2d 370, 374 (Ala. 1993). "`[N]o ground for granting a new trial will be more carefully scrutinized or more rigidly limited than that the verdict is contrary to the weight of the evidence.'" Sizemore v. Patel, 702 So.2d 172,174 (Ala.Civ.App. 1997) (quoting Delchamps, Inc. v.Larry, 613 So.2d 1235, 1239 (Ala. 1992)). "`[T]he denial of a motion for a new trial [on the ground that the verdict is against the weight and preponderance of the evidence] will not be reversed . . . unless, after allowing all reasonable presumptions as to the verdict's *Page 925 
correctness, the preponderance of the evidence is so against it that this Court is clearly convinced that it is wrong and unjust.'" Med Plus Props, v. Colcock Constr.Group, Inc., 628 So.2d at 374 (quoting Deal v.Johnson, 362 So.2d 214, 218 (Ala. 1978)). In light of the following testimony by Harwood, we cannot conclude that the verdict was wrong and unjust:
 "Q. [by Harwood's counsel] And you are willing to, because that's the way the rules are, to let the jury decide when the commencement date was for the 200 days?
 "A. [by Harwood] Yes."
 4. Costs
Based on our holding with respect to the issue presented on R Ws appeal, we conclude that the trial court did not err in awarding costs to R W. See TolarConstruction, supra.
 5. The Summary Judgment in Favor of Willard on the Intentional-Interference Claim
Harwood alleged that Steve Willard, a principal in R W, tortiously interfered in his business or contractual relationship with AmSouth Bank by telephoning Brian Oatsvall, Harwood's loan officer at Am-South, and informing him that a payment dispute had arisen between R W and Harwood, that R W would be filing a lien on Harwood's property, and that the bank should disburse no more construction-loan funds to Harwood. Harwood claimed that Willard's telephone call resulted in AmSouth's refusal to allow Harwood to draw any more of the construction-loan proceeds. ~
In support of his motion for a summary judgment, Willard presented, among other things, the deposition testimony of Oatsvall. Oatsvall stated that, after receiving the call from Willard, he contacted the bank's legal department in Birmingham but made no changes to the terms of the construction-financing agreement with Harwood. Oatsvall said that, at the time of Willard's telephone call, Harwood's construction line of credit had already expired and had been converted into a permanent loan on November 28, 2003. No additional draws were available to Harwood after that date.
Appellate review of a summary judgment is de novo. Ex parteBallew, 771 So.2d 1040 (Ala. 2000). A motion for a summary judgment is to be granted when no genuine issue of material fact exists and the moving party is entitled to a judgment as a matter of law. Rule 56(c)(3), Ala. R. Civ. P. A party moving for a summary judgment must make a prima facie showing "that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Rule 56(c)(3);see Lee v. City of Gadsden, 592 So.2d 1036, 1038
(Ala. 1992). If the movant meets this burden, "the burden then shifts to the nonmovant to rebut the movant's prima facie showing by `substantial evidence.'" Lee,592 So.2d at 1038 (footnote omitted). "[S]ubstantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v.Founders Life Assurance Co. of Florida, 547 So.2d 870, 871
(Ala. 1989); see § 12-21-12(d), Ala. Code 1975.
One seeking to establish tortious interference with a contractual or business relationship must prove:
 "`"1) the existence of a contract or business relation; 2) the defendant's knowledge of the contract or business relation; 3) intentional interference by the defendant with the contract or business relation; 4) the absence of justification for the defendant's interference; *Page 926 
and 5) damage to the plaintiff as a result of the interference."'"
Parsons v. Aaron, 849 So.2d 932, 946 (Ala. 2002) (quoting Ex parte Awtrey Realty Co., 827 So.2d 104,108-09 (Ala. 2001), quoting in turn Soap Co. v. Ecolab,Inc., 646 So.2d 1366, 1371 (Ala. 1994)).
In addition, it is essential that a defendant who is alleged to have interfered with contractual relations be a "third party," or a "stranger" to the contract, Tom's Foods, Inc. v.Cam, 896 So.2d 443, 454 (Ala. 2004), because one cannot interfere with a contractual relationship to which he or she is a party, Bama Budweiser of Montgomery, Inc. v.Anheuser-Busch, Inc., 611 So.2d 238, 247 (Ala. 1992);Lolley v. Howell, 504 So.2d 253, 255 (Ala. 1987). Seealso Ex parte Blue Cross Blue Shield of Alabama,773 So.2d 475 (Ala. 2000) (holding that, because a dentist and his patient contracted with each other in reliance upon the contractual obligation of the health insurer to pay for dental services covered by the policy between the health insurer and the patient, the health insurer was a party to the contract between the dentist and his patient).
In Tom's Foods, Inc. v. Cam, supra, the Alabama Supreme Court further explained what is meant by a "stranger to the contract":
 "In Waddell [] Reed, Inc. [v. United Investors Life Ins. Co., 875 So.2d 1143
(Ala. 2003)], this Court recognized that `[a] defendant is a party in interest to a [business or contractual] relationship if the defendant has any beneficial or economic interest in, or control over, that relationship.' 875 So.2d at 1154. Waddell and Parsons [v. Aaron, 849 So.2d 932 (Ala. 2002)] also relied upon the case of Atlanta Market Center Management Co. v. McLane, 269 Ga. 604, 608, 503 S.E.2d 278, 282 (1998). In Atlanta Market Center, the Supreme Court of Georgia stated:
 "`. . . .
 "`In Jefferson-Pilot Comm. Co. v. Phoenix City Broadcasting, 205 Ga. App. 57, 60, 421 S.E.2d 295
(1992), the shadow of liability for tortious interference was further diminished when the Court of Appeals reasoned that "all parties to a comprehensive interwoven set of contracts which provided for the financing, construction, and transfer of ownership" were not strangers, i.e., the purchaser of a radio station was not a stranger to the contractual relations between the radio station's seller and the seller's lenders. Thus, in order for a defendant to be liable for tortious interference with contractual relations, the defendant must be a stranger to both the contract and the business relationship giving rise to and underpinning the contract. . . .'
 "269 Ga. at 608-09, 503 S.E.2d at 282-83."
Tom's Foods, 896 So.2d at 454-55.
We conclude that, in opposition to Willard's properly supported summary-judgment motion, Harwood failed to present substantial evidence indicating either that he had been damaged as a result of Willard's alleged interference with his relations with AmSouth or that Willard was a stranger to the contract between Harwood and AmSouth. As Oatsvall's deposition testimony indicates, Harwood's construction-financing loan had been converted to a permanent loan before Willard's telephone call to Oatsvall; thus, Harwood's inability to draw on the construction-loan proceeds after November 28, 2003, was not caused by Willard's conversation with Oatsvall.
Moreover, as a co-owner of R W, Harwood's general contractor on the construction project, Willard was a party in interest to the construction-loan financing *Page 927 
agreement between Harwood and Am-South because he had an economic interest in that relationship. See Waddell Reed, supra; Jefferson-Pilot Commc'ns Co. v. PhoenixCity Broad., 205 Ga.App. 57, 421 S.E.2d 295 (1992) (quoted in Tom's Foods, 896 So.2d at 454-55). We hold that the trial court did not err in entering the summary judgment in favor of Willard.
 Conclusion
The trial court's denial of R Ws motion for an attorney-fee award is reversed and the cause is remanded with instructions to award R W a reasonable attorney fee. In all other respects, the judgment of the trial court is affirmed.
APPEAL — REVERSED AND REMANDED WITH INSTRUCTIONS.
CROSS-APPEAL — AFFIRMED.
THOMPSON, P.J., and PITTMAN, BRYAN, and MOORE, JJ., concur.
[1] One of R Ws subcontractors, Curry Landscaping, Inc., also filed a lien-enforcement action against Harwood. That action was consolidated with R W's action. The claims of Curry Landscaping were dismissed with prejudice before the trial of this case.
[2] It appears that only 206 days elapsed between October 29, 2002, and May 23, 2003.